# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-30375

United States Court of Appeals
Fifth Circuit

**FILED**
November 3, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

TROY KENDRICK, JR., also known as 99,

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

ON PETITION FOR REHEARING

Before STEWART, DENNIS, and HAYNES, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Treating the Petition for Rehearing En Banc as a Petition for Panel Rehearing, the Petition for Panel Rehearing is DENIED. No member of the panel nor judge in regular active service of the court having requested that the court be polled on Rehearing En Banc (Fed. R. App. P. and 5TH Cir. R. 35), the Petition for Rehearing En Banc is DENIED.

The opinion is WITHDRAWN, and the following opinion is SUBSTITUTED:

Defendant-Appellant Troy "99" Kendrick was charged and convicted of conspiracy to distribute cocaine base ("crack cocaine") and possession of a firearm by a convicted felon. He now contests the Government's Title III

No. 19-30375

wiretap that intercepted calls and text messages from his phone, the sufficiency of the evidence on his drug conspiracy conviction, the district court's sentencing enhancement for possessing a firearm, and the effectiveness of counsel. We affirm.

I.

The context surrounding Kendrick's Title III wiretap, motion to suppress, and jury trial and subsequent sentencing are set forth below.

A.

Wiretap and Search Warrant

The wiretap events are drawn from Drug Enforcement Administration (DEA) Special Agent (SA) Scott Arseneaux's supporting warrant affidavits.

1. *The Garrick Jones Surveillance and Wiretap*. The DEA and St. John Parish Sheriff's Office (SJPSO) initially investigated Kendrick's co-defendant Garrick "Gnu" Jones and used a reliable confidential source/informant to surveil Jones distributing crack cocaine. The narcotics transactions involving the informant and Jones occurred on January 4 and February 17 of 2016, and on March 10, the informant was involved in a physical altercation with Jones.

- **January 4**: The DEA and SJPSO officials witnessed the informant contact Jones at his phone number, Telephone #1,[1] to arrange meetings to purchase crack cocaine. The informant met with Jones at Jones's Reserve, Louisiana home and purchased 12 grams of crack cocaine. According to the informant, he witnessed Jones initially meet Kendrick in the front of Jones's home to purchase crack cocaine before subsequently selling the narcotics to the informant.[2]

- **February 17**: The DEA and SJPSO again observed the informant contact Jones (via Telephone #1) to arrange a meeting to purchase a half-ounce of crack cocaine from Jones. Once the informant and Jones

---

[1] The cellular phones are given shorthand references because these devices were later subject to court-authorized wiretaps.

[2] A subsequent SJPSO police report determined that Kendrick was misidentified in this January transaction. *See*, *infra*, Sect.I.B.

2

agreed to meet, the DEA and SJPSO surveillance units followed the informant as he or she traveled to Jones's home wearing a recording device. After the informant arrived at Jones's residence, the DEA and SJPSO observed Jones walk to the next-door neighbor's home to meet with an unknown individual, who was later identified as Kendrick.[3] After meeting with Kendrick, Jones returned to his residence to complete his transaction with the informant that was for approximately 12 grams of crack cocaine.

- **March 10**: The DEA and SJPSO directed the informant to contact Jones to purchase more crack cocaine, but Jones never responded. Later that day, co-defendant Travis "Tree" Carter (1) contacted the informant; (2) informed the informant that Carter would be taking over for Jones; and (3) told the informant to meet him at another Reserve location. The informant met with Carter and shortly thereafter, sent a distress signal to the DEA and SJPSO. The DEA and SJPSO officials arrived and witnessed Jones and Carter fleeing the scene after attempting to assault the informant with a piece of lumber. Jones and Carter were arrested and subsequently released because the informant did not want to press charges in fear of retaliation.

In late April, SA Arseneaux attested to the foregoing investigative facts as a basis for probable cause to obtain a wiretap on Jones's Telephone #1. A district judge signed an order authorizing the Title III wire intercepts, and on May 12, the DEA officials began monitoring Telephone #1.

- **May 12**: The DEA agents intercepted an incoming 4:07 p.m. call from an unidentified woman calling Jones. The unidentified woman asked for "a dime," and Jones confirmed that he was in possession of one. A minute later (4:08 p.m.), Jones sent a text message to a number associated with Telephone #2, which the authorities determined was Kendrick's telephone number. Jones's text message asked Kendrick where he was located, and Kendrick responded: "leaving Home Depot."

- **May 17**: The DEA agents intercepted an incoming 9:32 a.m. call from another woman calling Jones. During the call, Jones described a recent situation where he "flushed everything [he] had last night" because he was supposedly concerned about law enforcement surrounding his

---

[3] According to the informant, Jones actually stated that he was meeting "99," Kendrick's alias.

home.   The caller then inquired as to whether Jones "re-up['ed],"
and Jones stated that he was "waiting on my [sic] to come through right
now."   Five minutes after the call ended (9:37 a.m.), the agents
intercepted an outgoing call from Jones to Telephone #2, where
Kendrick picked up and greeted Jones.  Jones replied that he "need[ed]
[Kendrick] til tomorrow man" to which Kendrick stated, "I got you."
Jones subsequently sent an outgoing 3:31 p.m. text message to the
number that called him at 9:32 a.m., stating "I'm back gud."

- **May 20**: Jones sent an outgoing 5:00 p.m. text message to Telephone #2,
  stating "Bring me 1."  At 5:48 p.m., Kendrick (using Telephone #2) called
  Jones, asking Jones where Jones was currently located.  Jones informed
  Kendrick that he was "in the truck with Tree [and that he was] coming
  to get that [in a] little bit, man."  Kendrick told Jones that he was at a
  Valero gas station and Jones confirmed that he was "about to be coming
  to get that."

2. *The Kendrick Wiretap*.   Based on the foregoing intel, SA Arseneaux
submitted a Title III wiretap affidavit in which he attested and analyzed the
investigative facts to conclude (based on his experience) that Jones relied on
Kendrick as his drug supplier.  He also believed that there was probable cause
to monitor Kendrick's Telephone #2, and on June 13, the Title III wiretap
request was granted (via court order) for a 30-day window.

- **June 13**: The DEA agents intercepted an incoming 3:59 p.m. text
  message from Kendrick to Jones, stating "Wya"—which is a common
  acronym for "where you at."  One minute later (4:00 p.m.), the agents
  intercepted an incoming text message from Jones to Kendrick, stating
  "Da Crib.  I need 1," and within seconds, Kendrick replied via text
  message, "[c]oming."

- **June 22**: The DEA agents intercepted an incoming 9:06 p.m. text
  message from Jones to Kendrick, asking "U around", and at 9:12 p.m.,
  Kendrick sent outgoing text message replying "Yes."  At 9:15 p.m., Jones
  responded (via text message) that he "need[s] 1."

- **June 23**: The DEA agents intercepted a series of text messages between
  Jaden "Jordy" Robertson and Kendrick, which included, in relevant
  part: an incoming 3:25 a.m. text from Robertson stating "Wats man? I

will have something today for u," and an outgoing 8:01 p.m. text message from Kendrick to Robertson stating, "Hey I need to buy 1 too."

3. *The Search Warrant and Kendrick Arrest.* Given the incriminating wiretap communications and other events (including, *inter alia*, Jones's drug transactions with the informant and the assault of the informant in March), SA Arseneaux concluded that based on his experience, Kendrick was Jones's supplier. He also believed there was probable cause to search Jones's and Kendrick's adjacent homes for evidence of drug trafficking. A search warrant application was presented to a magistrate judge, and the judge authorized the search.

In executing the warrant on Kendrick's home, the DEA officials located and seized: (1) a digital scale located on Kendrick's person; (2) two bottles of mannitol; (3) scattered cash amounting to roughly $10,000; (4) one loaded firearm; (5) an invoice listing items commonly used for growing marijuana; (6) packaging material; (7) a money counting machine; (8) a bulletproof vest; and, (9) concealed under the floorboard in the bedroom closet, a compartment that contained four handguns, ammunition, cash, a ski mask, and gloves. No narcotics were seized.

The DEA agents arrested Kendrick (along with his co-defendants Jones, Carter, Michael Sanders, and Reshad Frank), and a grand jury indicted them in a nine-count complaint for offenses related to drug trafficking.

B.

Motion to Suppress

Kendrick moved to suppress the evidence recovered from the Title III wiretaps.[4] Kendrick's main argument focused on a discrepancy between SA

---

[4] While Kendrick was represented by counsel at the time, he initially filed a pro se motion to suppress. The district court struck the motion and set forth a briefing schedule for Kendrick (with the assistance of counsel) to submit his suppression motion.

No. 19-30375

Arseneaux's affidavit and a SJPSO police report describing the January 2016 transaction involving the informant and Jones.  While the informant stated that Jones met with Kendrick during that drug transaction (*see, supra*, Sect.A.1), this police report stated that "the individual that was present . . . was in fact [codefendant] Travis Carter," not Kendrick.  Kendrick claims that the Government deliberately misidentified him.  In response, the Government posited that all the wiretaps were supported by probable cause and Kendrick's arguments point to SA Arseneaux's credibility, which is a jury question.

The district court held a hearing to determine whether Kendrick could demonstrate that the Government's affidavits contained deliberate falsehoods or were made with reckless disregard for the truth—thus, warranting an evidentiary hearing under *Franks v. Delaware*.  438 U.S. 154 (1978).  After hearing the parties' arguments, the court concluded that there were no deliberate falsehoods in the challenged affidavit and denied the motion.

C.

Trial and Sentencing

Kendrick's co-defendants pleaded guilty to various charges, but he pleaded not guilty and proceeded to trial.  Before trial, the grand jury returned a second superseding indictment that charged Kendrick with the following: Count 1 for conspiracy to distribute and possess with intent to distribute an unspecified quantity of powder cocaine, crack, and marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846; Count 2 for possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2); and Count 3 for possession of a firearm in furtherance of drug trafficking activity, in violation of 18 U.S.C. § 924(c)(1)(A) and 924(c)(1)(A)(i).

Kendrick's trial commenced thereafter and lasted four days.  The Government's trial evidence primarily consisted of: (1) the communications from the Title III wiretaps of Jones's and Kendrick's phones and the seized

items from searching Kendrick's home; (2) testimony from several co-defendants (Jones, Carter, Sanders) confirming that they bought varying amounts of crack cocaine from Kendrick; (3) testimony from a DEA drug trafficking expert opining that Kendrick was a "mid-to-high-level" drug dealer and that the digital scale was "a tool of the trade" for drug traffickers; and (4) testimony from the DEA agent that interviewed Kendrick post arrest, stating that Kendrick identified his supplier, confessed to buying one-fourth of a kilogram of powder cocaine about once per month between December 2015 and July 2016, and admitted to selling gram-quantities to Jones about fifteen times per month.

Kendrick's case-in-chief included his own testimony in which, *inter alia*, he attested to using the mannitol for dietary purposes and the scale was used to measure chemicals for his saltwater aquarium. He also testified that his admissions about drug dealing (during the DEA interview) were untruthful statements because he initially wanted to plead guilty.[5]

Upon deliberation, a jury convicted Kendrick on Counts 1 and 2, and acquitted him on Count 3.

At Kendrick's sentencing hearing, the district court agreed with the previously filed Presentence Investigation Report's (PSR) recommendation that Kendrick was an armed career criminal under the Armed Career Criminal Act (ACCA). This recommendation was based on Kendrick's 2002 conviction for distributing marijuana and 2003 conviction for cocaine distribution. Kendrick did not object.

The district court also recognized the PSR's four-level enhancement for possessing a firearm in connection with the drug conspiracy. Kendrick

---

[5] Shortly after his arrest, Kendrick signed a plea agreement pleading guilty to several counts, but he later withdrew his plea and filed his suppression motion.

No. 19-30375

submitted objections contesting this finding because he was not convicted of Count 3 and his firearm was not in close proximity to the paraphernalia and drug-manufacturing materials. The court informed Kendrick that it could consider facts and charges in which Kendrick was acquitted and make a finding by the preponderance of the evidence. In turn, because the firearms were in the vicinity of the mannitol and digital scale, the court agreed with the PSR's recommendation that the firearms were kept with the purpose of facilitating a drug operation and applied the enhancement. The court therefore sentenced Kendrick to an imprisonment term of 327 months.

Kendrick now appeals.

## II.

Kendrick seeks review of (1) the district court's motion to suppress decision; (2) his conspiracy conviction; and (3) the district court's sentencing enhancements.

He also sets forth a Sixth Amendment claim of ineffective counsel. He did not preserve this challenge for direct appeal. *See United States v. Valuck*, 286 F.3d 221, 229 (5th Cir. 2002) ("Sixth Amendment claims of ineffective assistance of counsel should not be litigated on direct appeal, unless they were previously presented to the trial court."). We therefore dismiss the Sixth Amendment claim without prejudice[6] and address the remaining challenges below.

## A.

### Motion to Suppress and *Franks* Hearing

According to Kendrick, the district court erred in its suppression motion ruling and denial of a *Franks* hearing. On review of a district court's motion

---

[6] A 22 U.S.C. § 2255 habeas motion is the appropriate procedural tool for this Sixth Amendment claim.

to suppress ruling, we review factual findings for clear error and conclusions of law de novo. *See United States v. Alvarez*, 127 F.3d 372, 373 (5th Cir. 1997).

In addressing a *Franks* hearing request, the Supreme Court has determined that "the Fourth Amendment entitles a defendant to a hearing on the veracity of a warrant affidavit if he can make a sufficient preliminary showing that the affiant officer obtained the warrant by recklessly including material falsehoods in a warrant application." *Melton v. Phillips*, 875 F.3d 256, 262 (5th Cir. 2017) (citing *Franks*, 438 U.S. at 171–72). If the preliminary showing is made and the hearing is granted, a warrant "must be voided if the defendant shows by a preponderance of the evidence that the affidavit supporting the warrant contained a false statement made intentionally or with reckless disregard for the truth and, after setting aside the false statement, the affidavit's remaining content is insufficient to establish probable cause." *United States v. Ortega*, 854 F.3d 818, 826 (5th Cir. 2017) (citing *Franks*, 438 U.S. at 155–56). To resolve a challenge to an affidavit's veracity, we first determine if it contains a false statement or material omission. If so, then we decide whether "the false statement [or omission was] made intentionally or with reckless disregard for the truth." Finally, "if the false statement is excised, does the remaining content in the affidavit fail to establish probable cause?" *Ortega*, 854 F.3d at 826.

Kendrick contends that SA Arseneaux's Title III wiretap affidavit contained false statements and material omissions that were reckless. Once these misstatements are removed under *Franks*, Kendrick maintains that what remains in the affidavit is SA Arseneaux's conclusory interpretations of Kendrick's otherwise innocuous calls and text—which are insufficient to support probable cause. We disagree. Probable cause still exists even if the allegedly false statements are excised.

9

No. 19-30375

"Probable cause exists when there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought [by the warrant] constitute fruits, instrumentalities, or evidence of a crime." *Kohler v. Englade*, 470 F. 3d 1104, 1109 (5th Cir. 2006).

The following table illustrates Kendrick's challenged statements in comparison to the affidavit's remaining content:

| Alleged Falsehoods and Omissions | Unchallenged Affidavit Content |
| --- | --- |
| • Misidentifying Kendrick as the individual involved in the January 2016 transaction with Jones and the confidential informant, when it was in fact Carter;<br><br>• Omitting context from the May 12 call that Jones and Kendrick had already spoken that day about meeting up before Jones received a request for narcotics, suggesting that the two had a legitimate reason for the call unrelated to drugs;<br><br>• Misclassifying a May 17, 2016 call as *outgoing* from Jones to Kendrick, when in fact it was *incoming* from Kendrick to Jones;<br><br>• Omitting exculpatory context from the same May 17 call in which Kendrick and Jones discussed non-drug-related topics including a basketball game for approximately four minutes after Kendrick asked Jones what he had going on during a lull in the conversation;<br><br>• May 20 call misclassifying Kendrick as the person near the | • February 17 transaction where the informant identified Kendrick as the supplier that Jones meets with during the drug deal;<br><br>• May 12 events in which an unidentified individual contacted Jones for a dime and a minute later, Jones contacted Kendrick to determine his location;<br><br>• May 17 exchange between Jones and Kendrick in which Jones said he needed Kendrick which occurred five minutes after a caller asked Jones if he resupplied his drug inventory; and<br><br>• May 20 text message from Jones to Kendrick stating "Bring me 1" followed by them coordinating a meetup location. |

No. 19-30375

| | |
|---|---|
| Valero gas station, when in fact it was Jones; and<br><br>• Omitting social calls between Kendrick and Jones that support the assertion that they had non-drug-related communications. | |

The remaining *unchallenged* affidavit content, *i.e.*, the February 17 transaction, the May 12 events, the May 17 exchange and the May 20 text message, along with the insertion of the improperly omitted context of the May 12 and May 17 calls, sets out events that SA Arseneaux believed indicated that trafficking offenses had been committed. These included Jones selling crack cocaine and Kendrick distributing crack cocaine to local dealers like Jones. Indeed, the affidavit's contents undoubtedly confirm that Jones sold drugs to the informant on one occasion where he met with Kendrick amidst completing the drug transaction; and when Jones needed to make local drug sales, he contacted Kendrick about resupplying him and they made efforts to meet. Consequently, we find that the totality of the circumstances supports a probable cause finding. *See United States v. Privette*, 947 F.2d 1259, 1261 (5th Cir. 1991) ("Probable cause existed here without any of the challenged material.").

In sum, because Kendrick failed to make "a sufficient preliminary showing that the affiant officer obtained the warrant by recklessly including material falsehoods in a warrant application," *Melton*, 875 F.3d at 256, the district court did not err in denying his request for a *Franks* hearing. Even if Kendrick had made a sufficient preliminary showing, he still would not have been entitled to relief. This is because, after excising the alleged falsehoods and omissions and inserting the improperly omitted context of the May 12 and 17 calls and texts, the affidavit still included numerous other incriminating facts

11

No. 19-30375

regarding Kendrick and his involvement with Jones, giving rise to probable cause.

The district court did not err in denying Kendrick's request for a *Franks* hearing. The district court's denial of Kendrick's motion to suppress was warranted.

## B.

### Conspiracy Conviction

Kendrick contends that the Government set forth insufficient evidence to convict him of conspiracy to distribute powder cocaine, crack cocaine, and marijuana under 21 U.S.C. § 841.  He avers that the Government's evidence only demonstrates a series of buyer-seller relationships, not a concerted action between himself and others.  We disagree.

Because Kendrick's sufficiency challenges were not preserved by an appropriately timed motion for acquittal, we review for plain error.  *See United States v. Suarez*, 879 F.3d 626, 630 (5th Cir. 2018).

To prove a 21 U.S.C. § 841 conspiracy to distribute narcotics, "the government must prove: (1) an agreement between two or more persons to violate the narcotics laws, (2) the defendant's knowledge of the agreement, and (3) the defendant's voluntary participation in the conspiracy." *United States v. Zamora*, 661 F.3d 200, 209 (5th Cir. 2011).  The offense's central tenet is the agreement, which may be "infer[red] . . . from . . . testimony and the other circumstantial evidence."  *Id.* (internal quotations and citation omitted).  But the agreement "is not to be lightly inferred." *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018).

The Government presented sufficient evidence to prove that Kendrick participated in a conspiracy to distribute crack cocaine.  These examples support this conclusion.  From Kendrick's home and person, the Government seized a digital scale, plastic wrapping, $10,000 (scattered in various cash

denominations), a money counting machine, a bulletproof vest, a ski mask, and a hidden compartment containing firearms.  An expert opined that the digital scale could be associated with drug distribution and that Kendrick was a "mid-to-high-level" drug dealer.  Upon his arrest, Kendrick identified his main supplier and admitted that he would buy one-fourth of a kilogram of powder cocaine about once per month for a seven-month period, which he later sold to co-conspirators. *Cf. United States v. Atkins*, 746 F.3d 590, 605 (5th Cir. 2014) (upholding a conspiracy conviction where the suspect regularly purchased cocaine "in quantities large enough for redistribution").  He also identified Robertson as his "biggest customer", occasionally selling him one-ounce quantities of cocaine.

Also, each of Kendrick's co-defendants (Carter, Jones, and Sanders) testified that they regularly bought crack cocaine from Kendrick.  The wiretap recordings corroborated these dealings, especially as it pertains to Kendrick's dealings with Jones.  Various text messages from Jones to Kendrick ("Bring me 1"; "I need 1"; "need 1"; and "about to be coming to get that") indicated that Jones contacted Kendrick for resupplying his drug inventory.  Additionally, on these several occasions, Kendrick and Jones coordinated plans to meet.  And the pen register and trace data revealed a large volume of calls and text messages between Kendrick and Jones in a 24-day period.

Taking the evidence in totality, a reasonable juror could infer that Kendrick was not a one-off buyer or seller as his role was more than that of a mere acquirer or street-level user. *Cf. United States v. Maseratti*, 1 F.3d 330, 336 (5th Cir. 1993) (stating that mere acquirers and street-level users were shielded from conspiracy to distribute offenses).  There are various examples of Kendrick entered into an agreement with a supplier and/or his co-defendants (and other individuals) with the knowledge and intent to further the unlawful purpose of selling narcotics. *See United States v. Delgado*, 672 F.3d 320, 334

No. 19-30375

(5th Cir. 2012) (en banc) (finding an agreement between coconspirators because the suspect worked with a supplier and an intended buyer who shared an intent to distribute narcotics and "their relationship extended beyond one simple buy-sell transaction."). As such, a rational trier of fact could have found that Kendrick conspired with others to distribute crack cocaine. Accordingly, Kendrick's conviction was sound.

C.

Sentencing Enhancement

Lastly, Kendrick challenges the district court's two sentence enhancements for possessing a firearm in furtherance of drug distribution and defining him as an ACCA career offender. The former objection was preserved and therefore reviewed de novo, and the latter was not preserved and is reviewed for plain error. *See United States v. Benitez*, 809 F.3d 243, 248 (5th Cir. 2015) ("When challenges to a district court's interpretation or applications of sentencing guidelines are preserved, they are reviewed de novo; when unpreserved, they are reviewed for plain error.").

1. *Firearm Enhancement*. Kendrick's position is that the court erred in applying this enhancement because no drugs or drug paraphernalia were found at his home. As to the mannitol, Kendrick suggests that it was being used as a laxative, and with regard to the digital scale, he maintains that these are "innocent devices" that only become drug tools with supporting evidence. We disagree.

The Sentencing Guidelines' commentary provides that "in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia," an enhancement applies because "the presence of the firearm has the potential of facilitating" these types of offenses. *See* U.S.S.G. § 2K2.1 cmt. 14(B)(ii).

14

Whether Kendrick's firearms were in close proximity to drug paraphernalia/manufacturing materials has a straightforward answer—yes. In executing the search warrant, the agents seized four firearms and two bottles of Mannitol. Mannitol is a diuretic that is commonly used as a cutting agent to dilute cocaine into larger quantities of cocaine base or crack cocaine. *See Posters 'N' Things v. United States*, 511 U.S. 513, 515 (1994) (referring to mannitol as a drug diluent); *accord United States v. Blackshire*, 803 F. App'x 308, 312 (11th Cir. 2020) (Defendant admitting "that he used mannitol to make cocaine last longer."). Because the district court's finding that the mannitol was considered a drug manufacturing instrument was a plausible finding (given that it is a common cutting agent) and that the instrument was in the vicinity of Kendrick's firearms, the court correctly concluded that firearms were "found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia." U.S.S.G. § 2K2.1(b)(6)(B) cmt. n. 14(B)(ii). Consequently, we affirm the district court's application of this possession of a firearm enhancement.

2. *ACCA Career Offender Enhancement*. A defendant qualifies as a career offender under Sentencing Guidelines § 4B1.1(a) if he has "at least two prior felony convictions of either a crime of violence or a controlled substance offense" at the time he committed his offense of conviction. U.S.S.G. § 4B1.1(a)(3). Because Kendrick has a previous 2002 conviction for distributing marijuana and 2003 conviction for cocaine distribution, the conspiracy conviction at issue triggered the career offender classification.

Kendrick maintains that it was plain error to classify him as a career offender because conspiracy convictions should not qualify as "controlled substance offense[s]" under § 4B1.1(a). Both the Guidelines' commentary and our precedent hold otherwise.

15

No. 19-30375

A "controlled substance offense" is as "an offense under federal or state law . . . that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance . . . ." *Id.* § 4B1.2(b). The Guidelines' commentary explains that a "controlled substance offense include[s] the offenses of aiding and abetting, conspiring, and attempting to commit such offenses." *Id.* § 4B1.2 cmt. n.1 (emphasis added) (internal quotations omitted). And we have previously stated that this commentary note confirms that "[t]he Sentencing Commission has now lawfully included drug conspiracies in the category of crimes triggering classification as a career offender under § 4B1.1 of the Sentencing Guidelines." *United States v. Lightbourn*, 115 F.3d 291, 293 (5th Cir. 1997). Given that *Lightbourn* has not been overturned, its holding—conspiracies, like Kendrick's, qualify as controlled-substance offenses—remains binding here. *See id.*; *cf. E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 695 (5th Cir. 2014) (stating that the rule of orderliness requires the court to apply earliest Fifth Circuit articulation).

Accordingly, Kendrick's instant conspiracy conviction coupled with his 2002 and 2003 felony conviction deem him an ACCA career offender. The district court therefore did not commit plain error in applying this enhancement.

## III.

For the reasons set forth above, we AFFIRM the district court's motion to suppress finding; Kendrick's conspiracy to distribute conviction; and the court's sentencing calculation.