# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 21, 2023

Lyle W. Cayce
Clerk

———————

No. 22-30690

———————

United States of America,

*Plaintiff—Appellee*,

*versus*

Palma Jefferson, Jr.,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:19-CR-174-1

———————————————————————

Before Higginbotham, Smith, and Elrod, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:

Palma L. Jefferson, Jr. appeals the denial of numerous suppression motions related to his conviction for various drug trafficking charges, as well as being a felon in possession of a firearm. He further appeals the calculation of the relevant drug quantities and the application of the dangerous weapon enhancement in his sentence. Because of the independent source doctrine, and clear caselaw regarding his sentence, both Jefferson's conviction and sentence are AFFIRMED.

I

A

This case arises out of a Jefferson Parish Sheriff's Office investigation into Palma L. Jefferson, Jr. On April 29, 2019, Detective Benjamin Jones of JPSO was asked by the captain of the narcotics division to follow up on an anonymous tip regarding an individual transporting a "large amount of cocaine from the Baton Rouge area to the New Orleans metropolitan area." The tipster informed Detective Jones that the transportation of the cocaine would take place along Interstate 10 in a green Chevrolet Avalanche with a Saints emblem sticker on the rear window. Detective Jones informed his fellow investigators and had them set up surveillance along the described route. JPSO did not spot any vehicle resembling the one described by the tipster, despite waiting an hour past the timeframe the tipster gave them.

Detective Jones then called the tipster's number back. Recognizing the voice of the tipster, Detective Jones began to ask the tipster for more information regarding the alleged cocaine trafficker. During this second conversation with the anonymous tipster, Detective Jones received a number of key pieces of information. First, the supposed transporter of the cocaine went by the nickname "PJ." Second, the tipster described the destination of the cocaine as "the 'apartments behind Celebration Station' off of Veterans Boulevard" and further identified this location as PJ's residence. Detective Jones recognized this description as the Riverside Drive Apartments, a known high crime area. The tipster gave further insight into PJ's alleged operation, explaining that the Riverside Drive Apartment was PJ's "stash house" for drugs, but that most of the trafficking took place around Mazant Street because that was where PJ was from.

In order to help Detective Jones obtain the exact address of PJ's apartment, the tipster offered to use video chat to direct Detective Jones.

With the tipster's guidance, Detective Jones went to PJ's specific apartment within the Riverside Drive complex. The tipster gave detailed instructions to Detective Jones, including where to park, which staircase to walk up, and that the apartment was on the left-hand side. Further, the tipster said PJ's apartment had a blue blanket hanging in the window. Once Detective Jones reached the outside of the apartment the tipster confirmed 6220 Riverside Drive, Apartment 555 as PJ's residence with one hundred percent certainty.

After locating the apartment, the tipster expressed surprise that JPSO had not heard of PJ previously. The tipster mentioned that the nearby Kenner Police Department had recently seized a Corvette from PJ as part of a drug trafficking investigation and put the Corvette on display. Detective Jones asked Detective Carmouche to verify this information with the Kenner Police Department, as Detective Carmouche had worked there previously. Detective Carmouche reported back that the Kenner Police Department had indeed recovered a Corvette from a Palma Jefferson, Jr. Detective Jones also ran the 6220 Riverside Drive, Apartment 555 address through police databases. That address came back to Palma Jefferson as well. This name corresponds with the "PJ" nickname mentioned by the tipster. Palma Jefferson was also associated in police databases with an address on the 2300 block of Mazant Street, further corroborating the tipster's information. A police database also showed that Palma Jefferson, Jr. had recently finished serving parole for possession with intent to distribute narcotics, and possession of a firearm by a felon.

With all this information, JPSO began surveillance of both the Riverside Drive Apartment and the Mazant Street address. In the early morning hours of April 30, 2019, Detective Carmouche watched an individual (who ended up being Palma Jefferson, Sr.) exit the Mazant St. address, get in a truck, and conduct what looked like "hand-to-hand narcotics transactions." At approximately 7:15 a.m. on April 30, 2019, Detective Jones

watched Palma Jefferson, Jr. and his daughter leave his apartment (6220 Riverside Drive, Apartment 555) and walk toward their vehicle in the parking lot. Detective Jones and three other officers then decided to stop Jefferson.

## B

It is here that substantial differences begin to emerge in the parties' recounting of the facts. Jefferson argues that when Detective Jones and the other officers first approached him and his daughter, the officers had their guns drawn and aimed at them. He then alleges that the police immediately placed him in handcuffs while they conducted an "investigatory stop." This version of events comes specifically from Jefferson's daughter, K.J. She testified that both she and her father had already entered the car and put their seatbelts on before the officers confronted them with guns drawn and made them get out of the car. Jefferson argues this set of facts amounts to a *de facto* arrest without probable cause. *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) (stating that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation").

Alternatively, Detective Jones states that he, along with the other three officers, approached Jefferson and K.J. before they had entered the vehicle. Furthermore, Detective Jones claims neither he nor his fellow officers pointed firearms at Jefferson or his daughter. Rather, Detective Jones introduced himself to Jefferson as a narcotics investigator for JPSO, asked if they could talk, and informed Jefferson of his *Miranda* rights. According to Detective Jones, Jefferson made clear he understood his *Miranda* rights. Detective Jones then noted that Jefferson began looking nervously from side to side as if looking for an escape route. Detective Jones noted further that Jefferson's hand was shaking, causing his keys to jingle.

Jones claims that, during their conversation, Jefferson lied about living at Apartment 555 in the Riverside Drive Apartments. When challenged on

this point and told that the officers had just watched him exit Apartment 555, Jefferson confessed to having a large quantity of cocaine and a firearm inside the Riverside Drive apartment. Jones then asked if anyone else was inside Apartment 555. Jefferson replied that his girlfriend was in the apartment. According to the government, it was only after these incriminating statements that Jefferson was placed in handcuffs.

After the admission that someone else was in the apartment and that drugs were present inside, the officers decided "to enter the apartment and secure it to prevent the destruction of evidence, pending the securing of a lawful order of search." The officers found Jefferson's girlfriend after entering, and moved Jefferson, his daughter, and his girlfriend to the living room.

Jefferson alleges that while he was detained in the living room, and long before the search warrant application was even drafted, the officers began a full search of his apartment. He bases this allegation, in part, on timestamps from the camera used to take pictures. The camera recorded many photos as taken during the eight o'clock morning hour (the warrant was not approved until 9:07 a.m.). That is to say, Jefferson avers that the officers did more than just sweep the apartment in order to secure it. According to Jefferson, the officers, upon entry, immediately began "opening cabinets, removing air conditioner filters, flipping mattresses." Jefferson also alleges that it was at this time that the police began taking pictures of the evidence.

The government claims that it did not begin the full search until after receiving approval of a search warrant application. They explain the timestamps on the photos as a result of not having changed the camera's internal clock to Central Daylight Time from Central Standard Time. Detective Jones says he began drafting an application for a warrant to search Jefferson's apartment after the initial protective sweep of the apartment and

No. 22-30690

after Jefferson, his girlfriend, and his daughter were placed in the living room. Detective Jones did this drafting in the presence of Detective Richard Breaux, who signed Jones's application and sent it to a judge. The search warrant was approved at 9:07 a.m. It was then executed three minutes later at 9:10 a.m.

Later, Jefferson, his girlfriend, and his daughter were all brought in for questioning. Jefferson gave a statement which was videotaped with audio. In this statement, he admitted that all the evidence seized from Apartment 555 belonged to him.

C

Jefferson was charged with the following six crimes: (1) possession with intent to distribute heroin; (2) possession with intent to distribute cocaine; (3) possession with intent to distribute methamphetamine; (4) possession with intent to distribute marijuana; (5) possession of a firearm in furtherance of a drug trafficking crime; and (6) being a felon in possession of a firearm. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(i), 841 (b)(1)(B)(ii)(II), 841(b)(1)(A)(viii), 841(b)(1)(D); 18 U.S.C. §§ 922(g)(1), 924(a)(2). He was convicted on all charges except for possession of a firearm in furtherance of a drug trafficking crime.

At trial, Jefferson moved to suppress the evidence found by the government on a number of grounds. He argued that the officers searched his apartment without a warrant and that all evidence from said warrantless search should be suppressed. He further argued that the sworn affidavit attesting to probable cause implied that Jefferson had been arrested at 9:10 a.m. based on the items seized in the search. This would be only three minutes after the search warrant was approved.

Jefferson also averred that he was the subject of a *de facto* arrest when the police stopped him, handcuffed him, and detained him while they

searched his apartment. Jefferson challenged the use of his initial confession that cocaine and a gun were in the apartment. He claims he never made that statement, but that even if he did, it was obtained unlawfully (in part due to his unlawful arrest). Last, Jefferson argued that the search warrant affidavit and the arrest warrant affidavit omitted the fact that evidence had been obtained unlawfully and that he was therefore entitled to a *Franks* hearing.

The district court denied Jefferson's motion to suppress. The district court determined that Detective Jones's testimony was more reliable than K.J.'s. Specifically, it found Detective Jones was both "detailed" and "credible." In contrast, the district court found K.J. was not reliable. K.J.'s account of what happened differed even from the facts that her father listed in his motion to suppress. Plus, she was young, had difficulty remembering what happened, and had every reason to aid her father. The district court further stated that even if Jefferson had been handcuffed prior to admitting to having cocaine in the apartment, that action by the government only amounted to an investigatory stop rather than a full-blown arrest. In addition, that investigatory stop was based on reasonable suspicion. The district court also determined that the pictures timestamped prior to the issuance of the warrant were explained by a failure to change the internal clock of the camera to Central Daylight Time from Central Standard Time.

Finally, the district court denied Jefferson's request for a *Franks* hearing. The district court found that Jefferson presented no evidence that he did not make the admission about the cocaine and the gun being present in the apartment. In addition, the district court found that there was sufficient evidence to support probable cause coming from evidence not obtained in the alleged unlawful search. Accordingly, the evidence that was allegedly gathered unlawfully was not necessary for the government to meet the probable cause threshold. In addition, all the evidence from the alleged

warrantless search would be admissible under the independent source doctrine.

At sentencing, Jefferson objected to two aspects of his presentence investigation report. First, he objected to the methodology used to calculate his drug quantities. Jefferson argued that the methamphetamine quantities should be calculated as MDMA using the Converted Drug Weight in the guidelines, or in the alternative as Methamphetamine pills using the CDW in the guidelines, rather than multiplying the weight of the extremely small number of pills weighed. He also argued that the number of pills should be reduced by thirty-six because thirty-six of the pills were for personal use. Second, he objected to an enhancement that was applied to his sentence for possession of a firearm in furtherance of his drug crimes. He argued that because he was acquitted of the crime of possessing a firearm in furtherance of a drug trafficking crime, he should not receive an enhancement for possessing the gun because he only bought it for protection. Jefferson appeals the district court's overruling of his objections to the PSR.

## II

When reviewing a district court's denial of a motion to suppress and denial of a *Franks* hearing, this court applies *de novo* review for conclusions of law and clear error review for factual findings made by the district court. *United States v. Kendrick*, 980 F.3d 432, 439 (5th Cir. 2020). "Evidence is viewed in the light most favorable to the party that prevailed in the district court—in this case, the Government." *United States v. Nelson*, 990 F.3d 947, 952 (5th Cir. 2021) (citation omitted). When the denial of a motion to suppress is based on live testimony, "the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses." *United States v. Roper*, 63 F.4th 473, 476 (5th Cir. 2023) (quoting *Nelson*, 990 F.3d at 953).

Likewise, when reviewing a district court's application of the sentencing guidelines, this court uses *de novo* review. *United States v. Coleman*, 609 F.3d 699, 708 (5th Cir. 2010) (citation omitted). The factual findings undergirding that application are reviewed for clear error. *Id.*

### A

Jefferson argues that when the police first approached him, he became subject to a *de facto* arrest. He alleges that because he was handcuffed for a substantial period of time, was moved to a different location, and was confronted by numerous officers, the initial stop was transformed into a full arrest. Jefferson argues his situation is analogous to that of *United States v. Acosta-Colon*, where a *de facto* arrest occurred because the defendant was not allowed to travel, was moved to a different location, and placed in handcuffs. 157 F.3d 9, 15 (1st Cir. 1998). Further, if K.J.'s testimony is credited, the officers had firearms drawn when they confronted Jefferson. If Jefferson was subjected to a *de facto* arrest, he contends that his admission should be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

The government responds by arguing that no arrest took place until after Jefferson had admitted to having cocaine and a gun in the apartment. Further, they claim that no officers drew their guns, blocked Jefferson's car, nor prevented him from walking away. Instead, Jefferson was not handcuffed until after the admission. In the alternative, the government argues that this was not a stop at all, but a consensual encounter with police. *See United States v. Wise*, 877 F.3d 209, 219–21 (5th Cir. 2017) (determining there was no stop where defendant complied with police requests to see identification and search his bag). We assume, *arguendo*, that the police stopped Jefferson and that this was not a mere consensual encounter.

9

No. 22-30690

A *Terry* stop is a brief detention used by officers to investigate suspected criminal activity. *See United States v. Sharpe*, 470 U.S. 675, 685–86 (1985). To justify a *Terry* stop, an officer only needs reasonable suspicion. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968) ("[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (footnote omitted)).

Here, reasonable suspicion is satisfied by the information from the tipster combined with the suspicious behavior Detective Jones noticed when he first approached Jefferson. Recall that Detective Jones observed Jefferson looking around nervously, as if for a path of escape. Detective Jones also noticed Jefferson's hand was shaking, causing his keys to jingle. Such behavior, along with the corroborated information from the tipster, justifies the officers' decision to stop Jefferson and ask him some basic questions.

The relevant analysis for whether a police seizure becomes a full arrest, as opposed to an investigatory stop, is whether a reasonable person would feel his movement has been sufficiently curtailed as to constitute full legal arrest. *Turner v. Lieutenant Driver*, 848 F.3d 678, 692–93 (5th Cir. 2017). A reasonable person is not one who is guilty and thus especially nervous or anxious. *Id.* Further, "[u]sing some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do not automatically convert an investigatory detention into an arrest requiring probable cause." *Id.* at 693 (quoting *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993)). *Turner* makes clear that even assuming the officers had drawn their firearms, the stop still might have been a mere investigatory stop for which the officers would only need reasonable suspicion. *Turner*, 848 F.3d at 693.

No. 22-30690

The district court heard the evidence and favored the testimony of Detective Jones over that of Jefferson's daughter. We cannot say that determination was clear error. *See Roper*, 63 F.4th at 476 ("Where, as occurred here, 'a district court's denial of a suppression motion is based on live oral testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses.'" (citation omitted)). After Jefferson admitted he had cocaine and a gun inside the apartment, the police then had probable cause to make the full arrest. Therefore, the initial stop and eventual arrest of Jefferson were lawful.

B

Jefferson argues that the officers unlawfully entered his apartment without a warrant. In particular, Jefferson makes two arguments that no exigency exception to the warrant requirement applies. First, he avers that there was no reasonable belief that evidence was about to be destroyed. *See United States v. Thompson*, 700 F.2d 944, 947–48 (5th Cir. 1983) (holding law enforcement must be faced with a "now or never" scenario in order to qualify for the destruction of evidence exception to the warrant requirement) (quoting *Roaden v. Kentucky*, 413 U.S. 496, 505 (1973)). Second, even if there was a threat that the evidence was about to be destroyed, Jefferson argues that the police created that exigency themselves. "Agents cannot justify their search on the basis of exigent circumstances of their own making." *Thompson*, 700 F.2d at 950 (citations omitted).[1]

---

[1] Jefferson also argues that the officers violated 18 U.S.C. § 3109 for not knocking and announcing. Because this argument has no impact on whether Jefferson is entitled to a suppression hearing, we do not address it. Jefferson admits in his brief that the remedy for a violation of § 3109 is not exclusion of evidence.

11

We do not address the merits of Jefferson's unlawful entry argument. Even if the police had entered Jefferson's apartment unlawfully and searched the premises without a warrant, the evidence obtained could still be admitted under the independent source doctrine. Evidence that is "received through an illegal source is considered to be cleanly obtained when it arrives through an independent source." *United States v. Hearn*, 563 F.3d 95, 102 (5th Cir. 2009) (quoting *Murray v. United States*, 487 U.S. 533, 538–39 (1988)).

Not every bad act by the police ultimately results in suppression of evidence. The independent source doctrine allows the government to admit evidence if the officers had other means to obtain it lawfully. *See United States v. Restrepo*, 966 F.2d 964, 969 (5th Cir. 1992) (stating that the independent source doctrine reflects "'the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied' had the misconduct not occurred." (quoting *Murray*, 487 U.S. at 542)).

The search warrant later obtained by police was made up of corroborated evidence from the tipster and Jefferson's own admission during the investigatory stop that drugs and a gun were in the apartment. *See United States v. Bryan*, No. 00-31491, 2001 WL 1468508, at *3 (5th Cir. Oct. 29, 2001) (unpublished) (stating that the second search after obtaining a valid search warrant using evidence not found in the first search "remove[d] any taint from the original seizure").

## C

Jefferson argues that he is entitled to a *Franks* hearing primarily because of the timestamps on the photos taken from his apartment. The first photograph has a timestamp of 8:18 a.m. (49 minutes before the search warrant was approved). Because this alleged violation was not included in

the application for a search warrant, Jefferson argues that it constitutes a preliminary showing of reckless disregard for truth.

The government responds that the timestamps can merely be explained as an administrative error. The internal clock on the camera had not been changed from Central Standard Time to Central Daylight Time. This means that the internal clock for the camera was an hour ahead of the actual time the photos were taken. This would mean that the first photo was taken at 9:18 a.m. (11 minutes after the search warrant was approved).

While this may be a close question as a matter of first impression, we cannot say it was clear error for the district court to credit the government's version of events. *Kendrick*, 980 F.3d at 439.[2]

Regardless, Jefferson does not clear the bar to obtaining a *Franks* hearing. *Franks* hearings require that the defendant show "deliberate falsehood" or a "reckless disregard for the truth" on the part of the officers. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). That showing must point out what part of the warrant affidavit is false. *Id.* "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Id.* The district court found that none of this took place. "Indeed, defendant has not pointed to any concrete evidence that could demonstrate the affiant's deliberate falsehood or reckless disregard for the truth."[3] Nowhere in the record does Jefferson provide any

---

[2] Furthermore, the independent source analysis above applies here as well. None of the photos taken were used to support the search warrant application.

[3] Even if Jefferson had provided the requisite concrete evidence, *Franks* also states that "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171–72 (footnote omitted). Here there is sufficient evidence to justify the search warrant without the pictures. The

No. 22-30690

sworn statements.    He only points to the timestamps and other misstatements.[4]

### III

### A

Jefferson correctly points out that the government did not weigh every bit of the drugs they seized from his apartment.  Instead, only a tiny fraction of the drugs was weighed.  Those weights were averaged and multiplied in order to estimate the total weight of the drugs.  On appeal, Jefferson is only contesting the methamphetamine calculation.  He argues that those pills should be measured as MDMA instead of methamphetamine because only a few of the MDMA pills were analyzed and those pills had some methamphetamine present.  But that does not mean that the other pills are not pure MDMA as initially suspected.[5]

In the alternative, Jefferson argues that the pills should be measured under the "typical weight" methodology.  "If the number of doses, pills, or capsules but not the weight of the controlled substance is known," the guidelines instruct calculation to be performed by multiplying "the number

---

tipster's corroborated information along with the admission means no *Franks* hearing is required.

[4] Jefferson also argues that his arrest warrant is invalid.  He points out that the search warrant was approved at 9:07 a.m. but that he was arrested at 9:10 a.m., only three minutes later.  This would mean that the arrest took place even before any pictures were taken under the government's timeline.  This is explained as a mere clerical error, or a lack of ability to list both times on the form.  The probable cause affidavit in the arrest warrant states that "on the above date and time, agents executed a lawful order of search . . . ."  The above time is 9:10 a.m.  However, that time is written on a line labeled "time of arrest."

[5] Jefferson's argument that the number of pills should be reduced because some of them were for personal use is not addressed because the thirty-six-pill reduction could not possibly impact his guideline range no matter how the weight is calculated.

14

of doses, pills, or capsules by the typical weight per dose in the table below to estimate the total weight of the controlled substance." U.S. Sent'g Guidelines Manual § 2D1.1 cmt. n.9 (U.S. Sent'g Comm'n 2021). This would result in a lower guideline range for Jefferson.

Jefferson's argument is unpersuasive because the end of note nine of the commentary to the guidelines states: "Do not use this table if any more reliable estimate of the total weight is available from case-specific information." *Id.*

Using a measured weight for each different type of pill and extrapolating is more accurate than using the statutorily provided number when the weight of each individual pill is unknown. Further, the few tested pills all tested positive for methamphetamine. It is therefore reasonable to extrapolate from the tested pills to the rest of the pills that are the same type. *See United States v. Dinh*, 920 F.3d 307, 313 (5th Cir. 2019) (stating that "sentencing courts are permitted to extrapolate the nature and quantity of drugs in an offense based on lab reports that tested only a sample of the overall quantity" (citations omitted)). It was not error for the district court to accept these results.

B

Jefferson received an enhancement for possessing a firearm. U.S.S.G. § 2D1.1(b)(1). Jefferson argues that because he was acquitted of count five of his indictment (possession of a firearm in furtherance of a drug trafficking crime) he should not have a sentence enhancement applied to him for possessing a dangerous weapon. Jefferson asserts that the gun was for protection because he lived in a dangerous neighborhood.

Jefferson's argument is foreclosed by our precedent. We have previously held that the requirement for the sentencing enhancement is lower than the requirement for the actual charge of which Jefferson was

acquitted.  *See United States v. Akins*, 746 F.3d 590, 610 (5th Cir. 2014).  In *Akins*, the gun was also found along with drugs and under a mattress.  We said it was not clear error to determine the weapon was connected to the drug offense and to therefore apply the enhancement.  *Id.*

In addition, "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  U.S.S.G. § 2D1.1 cmt. n.11(A).  The example in the comment is an unloaded hunting rifle in a closet.  *Id.*  Here, unlike a hunting rifle in a closet, the gun was found with the drugs.  It is not improbable that a gun found with narcotics would be connected to the drug trafficking offense.

*         *         *

For the foregoing reasons, both Jefferson's conviction and sentence are AFFIRMED.