# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 21, 2025

Lyle W. Cayce
Clerk

No. 23-60286

United States of America,

*Plaintiff—Appellee*,

*versus*

Donovan Sherill Bourrage; Orlando Bourrage,

*Defendants—Appellants*.

---

Appeals from the United States District Court
for the Southern District of Mississippi
USDC Nos. 3:22-CR-45-1, 3:22-CR-45-2

---

Before Richman, Willett, and Douglas, *Circuit Judges*.

Priscilla Richman, *Circuit Judge*:

A jury found Donovan and Orlando Bourrage guilty of conspiracy to possess methamphetamine with the intent to distribute it in violation of 21 U.S.C. §§ 841 and 846. In this appeal, the defendants raise five issues, arguing that (1) their motions to suppress were erroneously denied, (2) a lead agent in the case should not have been permitted to testify about the meaning of coded language in conversations about drugs, (3) there was insufficient evidence to support the jury's verdict, (4) the district court gave a coercive jury instruction, and (5) the district court erred in enhancing their sentences. We affirm.

No. 23-60286

## I

Donovan Bourrage was found guilty on two counts, and Orlando Bourrage was found guilty on one count, of conspiracy to possess with the intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841 and 846. Both defendants, who are cousins, appeal their convictions and their sentences. Because Donovan and Orlando assert there was insufficient evidence to support their respective convictions, we recount the evidence "in the light most favorable to the jury's verdict."[1]

## A

Drug enforcement agents began investigating a suspected conspiracy to distribute methamphetamine in Kemper County, Mississippi, and the east-central Mississippi area in January 2020. Agent James McCombs co-led the investigation with another agent. The investigation began with controlled purchases from Donovan in January 2020; then, in May 2020, the court authorized a Title III wiretap of suspected conspirators' phones. During trial, the jury heard conversations between Donovan, Orlando, and their alleged co-conspirators, and Agent McCombs interpreted those conversations as part of his testimony.

The evidence at trial reflected that on May 21, the Bourrage cousins discussed the prices they charged for methamphetamine. Agent McCombs interpreted Donovan's statements as meaning that Donovan was paying a wholesale cost of $600 or $700 per ounce of methamphetamine and selling it for $1,200 per ounce. Later that day, on a call with Cordaryl Ford, a distributor of methamphetamine, Donovan told Ford that he had $10,000 or

---

[1] *United States v. Mesquias*, 29 F.4th 276, 279 (5th Cir. 2022) (citing *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011)).

2

$11,000 and wanted Ford to "give [him] what [he] c[ould]" of a methamphetamine delivery that was expected to arrive imminently.

On May 23, Donovan spoke with Orlando and said he wanted to buy methamphetamine from Orlando because he had run out, but Orlando only had marijuana. Donovan responded, "You know I don't sell that stuff, man." At the end of the call, Orlando told Donovan, "Help me get rid of them if you don't find none," and Donovan agreed.

On May 26, Ford told Donovan that his supply would "[b]e here in a couple more days," and Donovan told Ford that he would buy two pounds of methamphetamine from him once it arrived.

On May 28, Orlando gave Donovan a "heads up" that Ford had told him his shipment might be coming in that day but advised Donovan not to "hit him or nothing" because "he got his funny ways sometimes." Later that day, Donovan and Orlando spoke again, confirming that neither of them had heard from "him," referring to Ford. Orlando stated that Ford "didn't want [Orlando and Donovan] knowing each other was [sic] going down there" because he had his "funny ways." Donovan responded that he "was going to send [his] change when [Orlando was] ready," so Orlando would "take off and be on call." Orlando said he "was going to send [his] by [Donovan] because [Orlando] was at work." Donovan answered, "Yeah, but, uhm, either way though. You call me, I—we can do that. That's straight." Orlando agreed, "It doesn't bother me, one way or the other." That night, Orlando and Donovan spoke once again. They confirmed that neither had yet heard from Ford, observed that they had each requested the same amount of methamphetamine from Ford, and agreed that "we've made enough money to sit back and wait on another" supplier other than Ford.

Unbeknownst to the cousins, agents arrested Rondarius Gowdy on May 28 following a traffic stop when they found that he was transporting

drugs. Gowdy testified at Donovan and Orlando's trial that he had the drugs because someone offered him money if he "accept[ed] some marijuana through the mail, and all [Gowdy] had to do [was] just drop it off" at the home of Cordaryl Ford. The court also received into evidence Gowdy's plea agreement, and a prosecutor read aloud the factual basis of that plea agreement. Gowdy confirmed that the plea agreement accurately described the following events. Donovan and Orlando ordered methamphetamine from Ford "[o]n or about May the 28th," and the same day, officers arrested Gowdy after a traffic stop. At that traffic stop, the officers discovered "a package containing seven individually wrapped packages," five of which "contained suspected methamphetamine," while two "contained suspected marijuana."

On the morning of May 29, Orlando texted Donovan, "They got Ford. Don't call that phone." About fifteen minutes later, Orlando called Donovan, and they discussed Gowdy's arrest in Kemper County. Orlando stated, "Somebody talking," and Donovan responded, "Sure is." They then discussed the difficulties they had experienced in obtaining methamphetamine from Arizona in recent months.

**B**

A subsequent wiretap obtained recordings of calls between Donovan and a new supplier, Marice Boler, in July 2020. During his testimony, Boler identified Donovan as the person to whom he had distributed methamphetamine on July 6, 2020. Boler explained that a relative had asked him to deliver methamphetamine to Donovan. After listening to a call recorded right before Donovan and Boler met that day, Boler testified that they were meeting up to "[s]ell meth," and Boler would sell a pound of methamphetamine to Donovan. The jury then heard a call between the two men that took place on July 6 in which Donovan asked if Boler got his text,

and Boler responded, "You talking about the same thing, right?"  Donovan then said he had "enough for a half now. . . . If you don't wanna break it down, just give me a lil' minute."  Boler answered, "I'll break it down . . . Meet me in a minute."  Boler testified that "the same thing" meant "meth," and "a half" meant a "half pound" of "meth."  In the next call, Boler told Donovan he "could probably have [Donovan] a half" and it would probably be "Thursday or something," to which Donovan responded, "[B]ring that half for me."  Boler testified that Donovan was trying to obtain half a pound of meth.

During Boler's testimony, the jury also heard a call between him and Donovan from July 11 when Donovan asked Boler to "bring [him] an eight" and said he would "give [Boler] a dollar" for it.  Boler testified that "an eight" referred to a "[h]alf pound of meth," and "a dollar" meant a hundred dollars.  In a conversation just over an hour later, Boler told Donovan that he was not in town and did not have anybody available to meet him, and Donovan responded, "I still got them [two] you sold me.  I was just trying to stack up, bro."  Boler then responded that he would "have it for [Donovan]" when he returned to town.  Donovan answered, "I don't be moving sh*t, bro. I just put that sh*t up and wait 'til it get dry again, boy."  Boler testified that they were still talking about a half pound of methamphetamine, and the "two" that Donovan mentioned meant two pounds of methamphetamine that Boler had already sold him.  Boler additionally testified that he had been indicted for conspiracy to distribute methamphetamine and that he had pleaded guilty.

In September 2020, several months after the July phone conversations, deputies stopped Orlando for speeding and found that he was in possession of a 9mm semi-automatic pistol and 1,319.68 grams of marijuana, which appears to have been purchased from another supplier, Montreal Bourrage.

No. 23-60286

## C

In April 2022, a grand jury indicted Donovan and Orlando for conspiracy to possess with intent to distribute methamphetamine "beginning in May 2020, and continuing to on or about May 29, 2020." The grand jury additionally indicted Donovan for conspiracy to possess with intent to distribute "a mixture or substance containing a detectable amount of methamphetamine" during a period "beginning on or about July 6, 2020, and continuing to on or about July 10, 2020."

Prior to trial, Donovan and Orlando filed a motion to suppress the evidence obtained via wiretaps, which the district court denied. The case then proceeded to trial in May 2023 in the Southern District of Mississippi, and following a five-day trial, a jury found the defendants guilty on all counts.

The district court sentenced Orlando in February 2024, and his sentence included a three-level enhancement pursuant to United States Sentencing Guidelines § 3B1.1(b) for managing or supervising the conspiracy and a two-level enhancement pursuant to Guidelines § 2D1.1(b)(1) for possessing a gun. After initially sentencing Donovan in February 2024, the district court resentenced him in March 2024, and his sentence included a three-level enhancement pursuant to Guidelines § 3B1.1(b) for managing or supervising the conspiracy. Both defendants timely appealed.

## II

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 permits "[a]ny aggrieved person in any trial, hearing, or proceeding" to "move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that . . . (i) the communication was unlawfully intercepted; [or]

6

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face." [2]

Donovan and Orlando argue that the district court erred in denying their motion to suppress evidence obtained through wiretaps (A) by ruling that they did not have standing to challenge the wiretaps; (B) by ruling that the motion challenging the wiretaps was untimely; (C) by not ordering a *Franks*[3] hearing; and (D) by not recognizing that the orders authorizing the wiretaps were facially insufficient.

Orlando filed his motion to suppress and a supporting attorney affidavit on May 4, 2023. Orlando then filed a memorandum in support of the motion to suppress on May 8, 2023, and Donovan filed a motion to join Orlando's motion to suppress that same day. After a hearing on May 22, 2023, the district court denied the motion to suppress on the grounds covered in "the Government's argument in response." The Government maintains that those grounds for dismissal included untimeliness, lack of standing, and insufficiently specific allegations.

## A

Assuming without deciding that we must reach the standing issue, we hold that the defendants had standing. Title III allows "[a]ny aggrieved person" to "move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter."[4] The statute defines an "aggrieved person" as "a person who was a party to any intercepted wire,

---

[2] 18 U.S.C. § 2518(10)(a); *see* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 802, 82 Stat. 197, 221 (codified as amended at 18 U.S.C. § 2518(10)(a)).

[3] *Franks v. Delaware*, 438 U.S. 154 (1978).

[4] 18 U.S.C. § 2518(10)(a); *see* Omnibus Crime Control and Safe Streets Act § 802.

oral, or electronic communication or a person against whom the interception was directed."[5] Based on the Supreme Court's determination that "the wiretap statute incorporated existing Fourth Amendment standing principles,"[6] we have interpreted the statutory definition as meaning that "only 'one who participated in the intercepted conversation or on whose premises the conversation occurred' ha[s] standing to challenge the fruits of an illegal wiretap."[7] The party seeking suppression has "the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights."[8] "That burden includes establishing standing to contest the evidence."[9] "Whether a defendant has standing to question the legality of a search is a question of law subject to de novo review," and "[f]actual findings supporting the determination of the standing question are reviewed for clear error."[10]

The Government argues that this burden required each defendant to "establish that his communication was intercepted on a particular call or text message." The Government cites *United States v. Kelley*[11] to support that view, but in *Kelley*, we stated that the standing requirements were met simply

---

[5] *Id.* § 2510(11).

[6] *United States v. Kelley*, 140 F.3d 596, 604 n.7 (5th Cir. 1998) (citing *Alderman v. United States*, 394 U.S. 165, 175 n.9 (1969)).

[7] *Id.* (quoting *United States v. Scasino*, 513 F.2d 47, 50 (5th Cir. 1975)).

[8] *United States v. Turner*, 839 F.3d 429, 432 (5th Cir. 2016) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992)).

[9] *Id.* (citing *United States v. Iraheta*, 764 F.3d 455, 460-61 (5th Cir. 2014)).

[10] *Iraheta*, 764 F.3d at 460 (citing *United States v. Riazco*, 91 F.3d 752, 754 (5th Cir. 1996)) (providing the standard of review for a district court's determination of whether a defendant had standing to move to suppress evidence allegedly obtained in violation of his Fourth Amendment rights).

[11] 140 F.3d 596 (5th Cir. 1998).

"[b]ecause each of the above-named appellants participated in the complained-of intercepted communications" without any analysis of particular messages or calls.[12] In the original motion to suppress, Orlando asserted that he was an "'aggrieved person' within the meaning of 18 U.S.C.A. § 2510(11)," though neither he nor Donovan expressly asserted in that motion or in any other district court filing that they had participated in any conversations captured on the wiretaps.

The affidavit supporting the application for the May 2020 wiretap named both Donovan and Orlando as targets whose electronic communications the Government was aiming to intercept, and the affiant certified his belief that Donovan was using one of the target telephones. In an affidavit supporting an application for a subsequent wiretap, a federal agent certified his belief that Donovan's and Orlando's voices had been captured in conversations recorded in the May 2020 wiretap. Additionally, in a hearing regarding the motion to suppress before trial, Donovan's attorney argued, "[T]he essence of [the Government's] case is that that was Donovan Bourrage on that phone, and on several of those calls, he was talking to his brother [sic], Mr. Bourrage," and therefore, "that in and of itself establishes that the parties have standing to raise this issue before the [c]ourt." In this appeal, Orlando argues that he and Donovan have standing because the Government "identified [Orlando] as the target of the investigation" and government agents "testif[ied] that the intercepts did in fact involve [Orlando] (and Donovan) who was the target thereof." The trial record further makes clear that the defendants' voices appear frequently in the wiretapped calls and that their words appear frequently in the text messages. It would blink reality to hold that they did not participate in the

_____

[12] *Id.* at 604 n.7.

conversations, which was all that this court required in *Kelley*, and attorney admissions establish that participation. The Ninth Circuit has recognized standing to challenge a wiretap in an analogous situation.[13] Under these circumstances, the defendants had standing to challenge the wiretaps.

## B

"We review the district court's denial of a motion to suppress as untimely for abuse of discretion."[14] "Rule 12(c) of the Federal Rules of Criminal Procedure authorizes a district court to set a deadline for the filing of pretrial motions, including motions to suppress evidence."[15] Filing a motion to suppress after the deadline set for pretrial motions renders the motion "untimely," though the court may consider the motion "if the party shows good cause."[16] We have previously stated that "a showing of good cause requires a showing of cause and prejudice," but we have not yet "ruled

---

[13] *See United States v. Oliva*, 705 F.3d 390, 393, 395 (9th Cir. 2012) ("Irrespective of Oliva's refusal to admit that the voices in the conversations intercepted included his own or that any of the intercepts took place on his premises, Oliva was one of the individuals 'against whom the interception[s] w[ere] directed.' The affidavits in support of the surveillance orders included investigators' statements certifying their beliefs that he was using the individual cellular phones at issue. Oliva's conversations were the target of the surveillance. We therefore hold that Oliva has standing." (alterations in original) (citations omitted) (first quoting 18 U.S.C. § 2510(11); and then citing *United States v. Benjamin*, 72 F. Supp. 2d 161, 185 (W.D.N.Y. 1999))).

[14] *United States v. Dennis*, 41 F.4th 732, 739 (5th Cir. 2022) (citing *United States v. Oliver*, 630 F.3d 397, 410 (5th Cir. 2011)).

[15] *Oliver*, 630 F.3d at 411 (citing FED. R. CRIM. P. 12(c) ("The court may, at the arraignment or as soon afterward as practicable, set a deadline for the parties to make pretrial motions and may also schedule a motion hearing. If the court does not set one, the deadline is the start of trial.")).

[16] *Dennis*, 41 F.4th at 739 (first citing FED. R. CRIM. P. 12(c)(3); and then citing *United States v. Williams*, 774 F. App'x 871, 876 (5th Cir. 2019) (per curiam)).

on the standard of review of a district court's finding of lack of good cause under Rule 12(c)(3)."[17]

The district court initially set this case for trial on June 13, 2022, with a dispositive motion deadline twenty days before trial commenced and a non-dispositive motion deadline ten days before the dispositive motion deadline. After multiple continuances, the court reset the trial date for May 22, 2023, without mentioning any changes to the motion deadlines. The Government appears to have assumed that the final resetting of the trial date also reset the motion deadlines. Under that assumption, the deadline for dispositive motions would have been May 2, 2023, and the deadline for non-dispositive motions would have been April 21, 2023. Because the motion to suppress was filed on May 4, 2023, after any of the potential deadlines, we accept the Government's proffered deadlines. Furthermore, the parties agree that the dispositive motion deadline applies here. Therefore, we analyze the timeliness of the motion to suppress based on the May 2 dispositive motion deadline.

The May 4 submission missed the dispositive motion deadline by two days, so the defendants do not dispute that it was untimely. Instead, Donovan argues that "Orlando's trial counsel answered" the Government's argument that the motion was untimely "when she informed the court" that the delay was "not the fault of the defense for any late motion" but rather "the fault of the untimely disclosures" by the Government "of material evidence . . . that was collected and [that was] intended to [be] use[d] in this case that wasn't given to [the defense] until just days before trial." Donovan continues to quote Orlando's counsel as having stated at the hearing that she

_____

[17] *Id.* at 739-40 (citing *Williams*, 774 F. App'x at 876-77).

"was not his attorney at [the dispositive deadline date]. . . . so the deadline . . . had already passed at that time."

The argument that Orlando's attorney was new to the case does not excuse the delay because she became his attorney in September 2022, approximately eight months before the dispositive motion deadline. As to the allegedly untimely disclosures, neither defendant explains in his briefing before this court which Government disclosures were allegedly untimely or how those delayed disclosures brought the alleged lack of probable cause for the wiretaps to the defense's attention after the deadline. In her affidavit filed in the district court, Orlando's trial counsel pointed to two allegedly delayed disclosures: (1) a video interview with a codefendant that was, according to Orlando's attorney, disclosed to the defense on May 1, 2023; and (2) the files containing the wiretapped calls that were initially disclosed in November 2022 and January 2023, then re-produced on April 12, 2023, after the defense told the Government that the initially disclosed files were corrupted.

In his memorandum supporting the motion to suppress, Orlando identified a number of alleged misrepresentations in the affidavits supporting the applications for wiretaps that, he argued, called into question the probable cause justifying the wiretaps. In describing the materials that brought these alleged flaws to the defendants' attention, however, the memorandum cites only once to the interview with the codefendant and not at all to the files containing the wiretapped calls. Instead, many of the alleged deficiencies regarding the affidavits would have been apparent on the face of the affidavits themselves, without additional discovery.

Orlando's attorney briefly mentioned at the hearing that the affidavits and other investigative documents were initially "redacted" or "omitted" at certain parts, but she never explained which parts those were, why they were

material, or when the defense received unredacted versions. Pertaining to the alleged delay in producing the video, the Government stated at the hearing that the video was produced to Orlando's counsel "first on November the 15th of 2022," and then "again" the video "was ready for pickup on April the 28th of 2023," and the video was "picked up by counsel on May the 1st of 2023." This timeline weakens Orlando's attorney's allegation that she could not access that video interview until May 1, 2023. Given these circumstances, the defendants did not make a sufficient showing of good cause for the late filing of the motion to suppress, and, moreover, they made no attempt to show prejudice. Therefore, the district court did not abuse its discretion in denying the motions as untimely.

Our analysis of the motion to suppress, however, does not end there. "When a pretrial motion is denied as untimely, we review the denial of the motion for plain error."[18] Demonstrating plain error requires that the defendants "show a forfeited error that is clear or obvious, which affects [their] substantial rights."[19] If such a showing is made, we have "the *discretion* to correct the error, but only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings."[20]

## C

Donovan argues that the wiretaps were not supported by probable cause, so there should have been a *Franks* hearing regarding the veracity of the affidavits supporting the wiretap applications. "An order authorizing a wiretap, like an ordinary search warrant, must be supported by a finding of

---

[18] *Id.* at 740 (citing *United States v. Vasquez*, 899 F.3d 363, 373 (5th Cir. 2018)).

[19] *Id.*

[20] *Id.*

probable cause."[21]   "Probable cause exists when there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought . . . constitute fruits, instrumentalities, or evidence of a crime."[22]   In *Franks v. Delaware*,[23] the Supreme Court held that

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.[24]

Accordingly, "[t]o obtain a *Franks* hearing, [Donovan] 'needed to make a "substantial preliminary showing" that the affiant['s] statements were deliberately false or made with reckless disregard for the truth.'"[25]   Although *Franks* concerned search warrants,[26] we have previously considered whether a *Franks* hearing was merited to determine the veracity of an affidavit supporting an application for a Title III wiretap.[27]   "To resolve a challenge to an affidavit's veracity," we "first determine if it contains a false statement or material omission," and if it does, we then "decide whether 'the false

---

[21] *United States v. Collins*, 972 F.2d 1385, 1409 (5th Cir. 1992).

[22] *United States v. Kendrick*, 980 F.3d 432, 440 (5th Cir. 2020) (quoting *Kohler v. Englade*, 470 F.3d 1104, 1109 (5th Cir. 2006)).

[23] 438 U.S. 154 (1978).

[24] *Id.* at 155-56.

[25] *United States v. Minor*, 831 F.3d 601, 604 (5th Cir. 2016) (quoting *United States v. Thomas*, 627 F.3d 146, 159 (5th Cir. 2010)).

[26] *Franks*, 438 U.S. at 155.

[27] *Kendrick*, 980 F.3d at 439-42.

statement [or omission was] made intentionally or with reckless disregard for the truth.'"[28]  Lastly, we ask, "if the false statement is excised, does the remaining content in the affidavit fail to establish probable cause?"[29]  As noted above, because Donovan was untimely in submitting his motion to dismiss, we review his challenge to the lack of a *Franks* hearing for plain error.[30]

The Government argues that Donovan's *Franks*-hearing issue is waived because he did not request a *Franks* hearing in the district court. However, Orlando requested a hearing in the affidavit supporting his motion to suppress and cited *Franks* to substantiate that request in his supporting memorandum.  Donovan joined that motion.  The Government also responded to the *Franks* argument before the district court in its response in opposition to the motion to suppress.  Therefore, the issue was not forfeited.

Regarding the merits, Donovan does not identify on appeal which statements in the affidavits were "deliberately false or made with reckless disregard for the truth."[31]  Instead, he cites to the memorandum in support of the motion to suppress submitted to the district court and argues that the Government did not dispute the alleged misrepresentations but rather

---

[28] *Id.* at 440 (alteration in original) (quoting *United States v. Ortega*, 854 F.3d 818, 826 (5th Cir. 2017)).

[29] *Id.* (quoting *Ortega*, 854 F.3d at 826).

[30] *United States v. Dennis*, 41 F.4th 732, 740 (5th Cir. 2022) ("When a pretrial motion is denied as untimely, we review the denial of the motion for plain error." (citing *United States v. Vasquez*, 899 F.3d 363, 373 (5th Cir. 2018))).

[31] *United States v. Minor*, 831 F.3d 601, 604 (5th Cir. 2016) (quoting *United States v. Thomas*, 627 F.3d 146, 159 (5th Cir. 2010)).

"attempted to justify the affiant's action." Therefore, we have analyzed the filings submitted to the district court.

Before the district court, the defendants made no "substantial preliminary showing" of any alleged falsehoods in the affidavit supporting the May 20, 2020 intercept order. Though the memorandum at law mentioned that order, it only discussed allegedly false statements in the affidavits supporting the June 22, 2020 order and the June 30, 2020 order. Additionally, only Donovan challenges probable cause in the affidavits on appeal, and he was found guilty of partaking in two conspiracies, the first "beginning in May 2020, and continuing to on or about May 29, 2020," and the second "beginning on or about July 6, 2020, and continuing to on or about July 10, 2020." He does not challenge any sentencing enhancement pertaining to relevant conduct that occurred outside of those dates. Therefore, all wiretapped calls pertaining to those time frames would have occurred either in May 2020 or in early July 2020. Only the May 20 and June 30 wiretap orders would have recorded calls that occurred on those dates. Therefore, we only consider challenged statements that appear in the affidavit underlying the June 30 order, since there are no allegations regarding the May 20 order.

In reviewing the district court's denial of a *Franks* hearing when there has been no determination regarding the truth or falsity of alleged misstatements, we have previously reviewed the affidavits as if the challenged statements were not present to see whether "[p]robable cause still exists even if the allegedly false statements are excised."[32]

In the district court, the defendants argued that the affidavit underlying the June 30 order contained three allegedly false statements:

———————————————

[32] *See, e.g.*, *Kendrick*, 980 F.3d at 440-42.

(1) that agents made a "'controlled delivery' of a package containing 13 pounds of methamphetamine and one pound of marijuana"; (2) that "the 'controlled delivery' was addressed to 'a non-existent residence on Tamola Road'"; and (3) that Rondarius Gowdy, the man arrested while transporting the package, "stated to officers that [he] was paid $500.00 to deliver the package to Cordarryl [sic] [Ford] and that Gowdy provided officers the telephone number for [] Ford."

Even without those statements, the affidavit contains information to establish probable cause that Donovan was participating in a conspiracy to distribute methamphetamine. The affidavit recounts: (1) confidential informants had purchased methamphetamine from Donovan on five separate occasions in January and February 2020; (2) Donovan had a phone conversation in mid-May 2020 in which he told the caller that he had "ten thousand . . . eleven thousand on [him]" but that if the caller could not "do it all, then just give [Donovan] what" he could, and the affiant interpreted this conversation as Donovan having ten thousand or eleven thousand dollars in cash and wanting to purchase as much methamphetamine as the caller could sell him; (3) Donovan had a separate call with the same caller later that day that the affiant interpreted as the caller telling Donovan that he was about to sell his last four ounces of methamphetamine; (4) agents intercepted a package containing thirteen pounds of methamphetamine and one pound of marijuana that Rondarius Gowdy was transporting; (5) the day after Gowdy's arrest, Donovan spoke on the phone with Nathan Arnold, who had been arrested in 1997 for two counts of sales of crack cocaine, about Gowdy's arrest; in the latter conversation, Donovan opined that there should not have been marijuana mixed with the methamphetamine because that makes it easier for dogs to sniff the drugs; Donovan also affirmed that he was going to "shut it down" for a bit after the arrest; (6) other intercepts indicated that Donovan and Orlando "had [each] negotiated for as many as three pounds of

the seized methamphetamine;" (7) in mid-June 2020, Donovan had a text conversation with Terrance Bourrage that the affiant interpreted as Terrance telling Donovan to give an unknown person ten small packages of methamphetamine and that Terrance would bring Donovan the money the next day; (8) after that conversation with Terrance, Donovan sent Terrance another text saying, "We can't talk like that on the phone bro," which the affiant interpreted as Donovan directing Terrance "not to discuss in detail the prices of methamphetamine or how they conduct methamphetamine transactions over the phone."

This information, devoid of the challenged statements, was sufficient to establish probable cause. The court could infer that Donovan had a recent history of selling methamphetamine in early 2020 based on the sales to confidential informants. Additionally, the conversations with the caller in mid-May 2020 show Donovan's intent to purchase large quantities of methamphetamine. The court could infer from this that Donovan had ongoing methamphetamine transactions that involved purchasing large quantities and reselling methamphetamine to others. The information about Gowdy's arrest coupled with the interest Donovan showed in the arrest and seized drugs in the conversation with Arnold, plus the information that he had negotiated to purchase some of the seized methamphetamine, is sufficient to infer a connection between Donovan and the seized methamphetamine. Finally, Donovan's conversations with Terrance suggest an ongoing methamphetamine distribution scheme and that Donovan knew his activities were illegal, so they should not discuss them directly over the phone. Altogether, "the totality of the circumstances

No. 23-60286

supports a probable cause finding."[33]  Therefore, the district court did not err, let alone plainly err, in not holding a *Franks* hearing.

## D

Finally, Donovan argues that the orders authorizing the wiretaps were facially insufficient because they did not identify the "high-level Justice Department official" who authorized the applications.  In Donovan's reply, he acknowledges that he did not preserve this error in the district court, so he argues that it should be reviewed for plain error.  In this circuit, a "failure to raise specific issues or arguments in pre-trial suppression proceedings operates as a waiver of those issues or arguments for appeal."[34] "Nonetheless, our cases identifying such waiver have often proceeded to evaluate the issues under a plain error standard for good measure."[35]

Under the statute, "[e]ach order authorizing or approving the interception of any wire, oral, or electronic communication under this chapter shall specify . . . the identity of the agency authorized to intercept the communications, and *of the person authorizing the application*."[36]  The statute specifies that those empowered to authorize such an application include "any Deputy Assistant Attorney General or acting Deputy Assistant Attorney

---

[33] *Id.* at 441-42.

[34] *United States v. Scroggins*, 599 F.3d 433, 448 (5th Cir. 2010) (emphasis omitted) (quoting *United States v. Pope*, 467 F.3d 912, 918-19 (5th Cir. 2006)).

[35] *Id.* (citing *United States v. Baker*, 538 F.3d 324, 329 (5th Cir. 2008)).

[36] 18 U.S.C. § 2518(4)(d) (emphasis added).

19

General in the Criminal Division or National Security Division specially designated by the Attorney General."[37]

In the present case, the "orders" that "authorize[]" agents to "intercept wire and electronic communications" to and from two separate telephone numbers name the Deputy Assistant Attorneys General who authorized the applications for the wiretaps. The orders specify that these Deputy Assistant Attorneys General are "duly designated official[s] of the Criminal Division, United States Department of Justice, who ha[ve] been specially designated by the Attorney General of the United States . . . to exercise the power conferred on that official by [18 U.S.C. § 2516]." Because these orders name the required Justice Department officials, Donovan is incorrect in arguing that the orders are "insufficient on [their] face[s]."[38] Therefore, the district court did not err in denying the motion to suppress on this ground.

## III

Orlando argues that the district court erred by admitting Agent James McCombs's testimony explaining the meaning of drug-related code words. Orlando "[s]pecifically" cites McCombs's explanation that the term "a bird and a half" means three pounds. The Government responds only to this specific testimony, and Orlando does not address the issue in his reply. McCombs explained the meaning of other code words during his testimony, and Orlando appears to challenge McCombs's code-word testimony writ large. We will assume without deciding that Orlando properly presented a challenge to all of McCombs's code-word testimony.

---

[37] *Id.* § 2516(1).

[38] *See id.* § 2518(10)(a)(ii).

The Government offered McCombs's code-word testimony as lay opinion testimony under Rule 701, and the defendants objected at trial. "This Court reviews preserved challenges to rulings on the admission of lay and expert testimony for abuse of discretion, subject to harmless error analysis."[39] "Under the harmless error doctrine, even if the district court abuses its discretion in admitting or excluding evidence, we will affirm '[u]nless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction.'"[40]

> Under Federal Rule of Evidence 701,
>
> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.[41]

Although "[d]rug traffickers' jargon is a specialized body of knowledge, familiar only to those wise in the ways of the drug trade, and therefore a fit subject for expert testimony," we have "not limited drug slang testimony to experts in all cases."[42] Rather, we have "recognized that testimony about the meaning of drug code words can be within the proper ambit of a lay witness with extensive involvement in the underlying investigation."[43]

---

[39] *United States v. Akins*, 746 F.3d 590, 597 (5th Cir. 2014).

[40] *United States v. Yanez Sosa*, 513 F.3d 194, 201 (5th Cir. 2008) (alteration in original) (quoting *United States v. Mendoza-Medina*, 346 F.3d 121, 127 (5th Cir. 2003)).

[41] Fed. R. Evid. 701.

[42] *Akins*, 746 F.3d at 599 (alteration in original) (quoting *United States v. Griffith*, 118 F.3d 318, 321 (5th Cir. 1997)).

[43] *Id.* (citing *United States v. Miranda*, 248 F.3d 434 (2001)).

Indeed, "[t]estimony need not be excluded as improper lay opinion, even if some specialized knowledge on the part of the agents was required, if it was based on first-hand observations in a specific investigation."[44]    This comports with Rule 701 because an "agent's 'extensive participation in the investigation of this conspiracy' allow[s] the agent to 'form opinions' about the code words 'based on his personal perceptions.'"[45]

In *United States v. Akins*,[46] we permitted the lead investigator of a drug conspiracy case to testify about the meaning of coded language "largely based on first-hand observations in this specific investigation."[47]  We emphasized that the agent

> was extensively involved in the investigation of the conspiracy. As the lead investigator on the case, [he] had conducted surveillance on a number of participants in the drug organization, and claimed to have reviewed every wiretapped phone call, reviewed every transcript offered into evidence, listened to 'every second' of all relevant conversations, and spoken with a number of informants, co-conspirators, and the defendants themselves.  [The agent] *repeatedly explained how this investigation led him to deduce the meaning* of drug code words.[48]

Consequently, we held that "[a]lthough [the agent] may have drawn in part from his law enforcement experience, it was not an abuse of discretion for the district court to rule that [the agent's] conclusions were largely based on first-

---

[44] *Id.* (alteration in original) (quoting *United States v. El-Mezain*, 664 F.3d 467, 514 (5th Cir. 2011)).

[45] *El-Mezain*, 664 F.3d at 514 (quoting *Miranda*, 248 F.3d at 441).

[46] 746 F.3d 590 (5th Cir. 2014).

[47] *Akins*, 746 F.3d at 600.

[48] *Id.* at 599-600 (emphasis added).

hand observations in this specific investigation."[49]  In a more recent case, we again permitted a similar lead investigator to testify under Rule 701 about the meaning of coded language based on his "extensive" participation in the case.[50]  There, we emphasized the agent's participation but did not consider whether the agent repeatedly explained how he deduced the meaning of the code words.[51]

In this case, the Government laid a foundation for McCombs's opinion testimony.  McCombs testified that he was "the case agent for [the Mississippi Bureau of Narcotics] as well as the case agent for [the Drug Enforcement Administration]" and that he "oversaw the parts of [this] investigation."  He testified that he employed numerous investigatory methods during the investigation over several months.  He testified that he monitored both live and recorded communications from the wiretap.  When asked how many wire interceptions involving drug-related communications he had listened to in this case, McCombs suggested he had listened to at least hundreds, answering, "There were way over a thousand calls on here, and I've listened to—[] I don't want to tell you every call because some calls may have not been pertinent and there was no reason for me to listen to."  He testified that he interpreted code words in this investigation.  He also explained his interpretive process: he first noticed that a word seemed out-of-place and then considered the context of the conversations in their entirety to understand the word.  McCombs further testified about specific codes, oftentimes in response to the Government asking him to answer "based upon [his] knowledge of the investigation."

_____

[49] *Id.* at 600.

[50] *United States v. Hill*, 63 F.4th 335, 356 (5th Cir. 2023).

[51] *See id.*

Although McCombs did not "*repeatedly* explain[] how this investigation led him to deduce the meaning of drug code words,"[52] our cases since *Akins* have not emphasized this as a requirement.[53] McCombs did explain at least once how he deduced the meaning of drug code words, and he repeatedly based his testimony on his involvement in the investigation. Orlando argues otherwise, asserting that McCombs "did not testify *primarily* based on the underlying conspiracy investigation." To be sure, at one point during cross-examination when asked, "If we're looking for this book that defines what's code for drug language, where do we buy that?," McCombs answered, "Go to work at the police department in 1998." This answer suggests that McCombs was relying in part on his professional experience prior to this investigation to understand these coded conversations. However, in the next exchange, when asked, "When you're saying these [interpretations] are how [the words are] used, these are based on what you believe; is that correct?," McCombs responded, "What I learned through the investigation, yes, sir." Considering these exchanges together, it was reasonable for the district court to determine that some of McCombs's background in drug codes came from his career experience, but when interpreting words in this case, he based these specific interpretations on "what [he] learned through the investigation." Therefore, the district court did not abuse its discretion in admitting this testimony.

## IV

Donovan and Orlando both argue that the Government presented insufficient evidence to prove beyond a reasonable doubt that they conspired to possess methamphetamine with the intent to distribute it. Proving "[a]

---

[52] *Akins*, 746 F.3d at 600 (emphasis added).

[53] *See Hill*, 63 F.4th at 356.

drug-trafficking conspiracy requires" showing "(1) the existence of an agreement between two or more persons to violate narcotics laws, (2) knowledge of the conspiracy and intent to join it, and (3) voluntary participation in the conspiracy."[54]

The "agreement to engage in the conspiracy alleged" need not have been express; "[a] tacit, mutual agreement with common purpose, design, and understanding will suffice."[55] The jury may "infer[]" that such an agreement existed based on "testimony and [] other circumstantial evidence."[56] Moreover, "[c]oncert of action can indicate agreement and voluntary participation" in the conspiracy.[57]

Though "[i]t is well settled that evidence of a buyer-seller relationship is not, by itself, sufficient to support a conviction for conspiracy," "the buyer-seller exception is meant to 'prevent[] a single buy-sell agreement, which is necessarily reached in every commercial drug transaction, from automatically becoming a conspiracy to distribute drugs.'"[58] The exception "shields mere acquirers and street-level users, who would otherwise be guilty of conspiracy to distribute, from the more severe penalties reserved for

---

[54] *United States v. McClaren*, 13 F.4th 386, 406 (5th Cir. 2021) (quoting *United States v. Nieto*, 721 F.3d 357, 367 (5th Cir. 2013)).

[55] *United States v. Daniels*, 723 F.3d 562, 575 (5th Cir. 2013) (quoting *United States v. Zamora*, 661 F.3d 200, 209) (5th Cir. 2011)).

[56] *United States v. Kendrick*, 980 F.3d 432, 442 (5th Cir. 2020) (quoting *Zamora*, 661 F.3d at 209).

[57] *United States v. Lopez*, 979 F.2d 1024, 1029 (5th Cir. 1992).

[58] *United States v. Jones*, 969 F.3d 192, 198 (5th Cir. 2020) (alteration in original) (first quoting *United States v. Mata*, 491 F.3d 237, 241 (5th Cir. 2007); and then quoting *United States v. Delgado*, 672 F.3d 320, 333 (5th Cir. 2012) (en banc)).

distributers."[59]  "Thus, '[w]hile it is true that a buyer-seller relationship, *without more*, will not prove a conspiracy, . . . [o]ne becomes a member of a drug conspiracy if he *knowingly participates in a plan to distribute drugs*, whether by buying, selling or otherwise.'"[60]  "Evidence of 'a strong level of trust and an ongoing, mutually dependent relationship'" also "changes the relationship to a conspiracy to distribute drugs."[61]

"When a defendant timely moves for a judgment of acquittal," as Donovan and Orlando did here, we "review challenges to the sufficiency of evidence *de novo*, but view the evidence in the light most favorable to the verdict."[62]  Because this review is "highly deferential to the jury's verdict," we "will reverse only if no rational jury could have found defendants guilty beyond a reasonable doubt."[63]

## A

Count one charged both Donovan and Orlando with conspiring "to possess with intent to distribute methamphetamine" during a period "beginning in May 2020, and continuing to on or about May 29, 2020, in Kemper County . . . and elsewhere."  Orlando argues that the Government failed to prove that he agreed to possess and distribute controlled substances with his codefendants, while Donovan argues that the Government failed to

---

[59] *Delgado*, 672 F.3d at 333 (citing *United States v. Parker*, 554 F.3d 230, 235-36 (2d Cir. 2009)).

[60] *Id.* (alteration in original) (quoting *United States v. Maseratti*, 1 F.3d 330, 336 (5th Cir. 1993)).

[61] *Jones*, 969 F.3d at 198 (quoting *Delgado*, 672 F.3d at 334).

[62] *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020) (quoting *United States v. Gonzalez*, 907 F.3d 869, 873 (5th Cir. 2018) (per curiam)).

[63] *United States v. Mesquias*, 29 F.4th 276, 279 (5th Cir. 2022) (citing *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016) (per curiam)).

prove that he voluntarily participated in any agreement and that all the Government showed was a buyer-seller relationship.

Taken together and viewed in the light most favorable to the jury verdict, the evidence presented at trial was sufficient for the jury to infer that Donovan and Orlando agreed to possess methamphetamine with the intent to distribute it and that they voluntarily participated in this agreement. From the cousins' May 21 discussion about prices for acquiring and reselling methamphetamine, the jury could reasonably conclude that they were purchasing the drug with the aim of selling it to others rather than for personal consumption. A jury could interpret Donovan's May 21 and May 26 conversations with Ford, as well as the cousins' awareness of Ford's "funny ways," as suggesting that Ford had a history of supplying them with methamphetamine as part of an ongoing arrangement. The jury could interpret Orlando's request on May 23 that Donovan "Help [Orlando] get rid of them if [Donovan] don't find none" as Orlando asking Donovan to help him sell his marijuana if Donovan could not procure any methamphetamine to sell, indicating that the cousins collaborated in selling drugs.

Likewise, the jury could infer from the cousins' second conversation on May 28 about their potential plans for picking up the drugs from Ford that they purposefully coordinated pickups and payments for drugs (sometimes paying on behalf of one another) because they were acting in concert. The jury could further construe their agreement later that night that—"we've made enough money to sit back and wait on another" supplier other than Ford—as suggesting that they shared money and profits from the venture, another indication of an agreement. Furthermore, when the cousins commented "[s]omebody talking" after they heard the news of Gowdy's arrest, the jury could interpret that statement as expressing shared concern that someone within their larger conspiracy might cause trouble for all of them. Their discussion about getting methamphetamine from Arizona could

further indicate to a jury that this conspiracy went beyond the two of them, Ford, and Gowdy, and it stretched across state lines. Altogether, this evidence shows an agreement that amounts to far more than the "conscious parallelism" that we deemed "insufficient to establish a conspiracy" in *United States v. Holloway*.[64]

Lastly, Gowdy's testimony about his arrest and the circumstances leading up to it gave the jury a basis for determining that Ford had expanded the conspiracy to include others, and the testimony concretely connected the various conspirators to an actual shipment of methamphetamine. Since Donovan and Orlando had ordered methamphetamine from Ford on the same day that Ford was supposed to receive a large package of methamphetamine via Gowdy, the jury could reasonably infer that Donovan and Orlando were aiming to repurchase some of the methamphetamine that Gowdy was supposed to bring to Ford.

These reasonable inferences starkly differentiate the instant case from *United States v. White*.[65] In *White*, we held that "[d]rug transactions alone do not constitute a conspiracy, and it would be an exercise in sheer speculation to conclude" from the admissible evidence "that a heroin conspiracy existed"; moreover, "such speculation . . . does not constitute proof beyond a reasonable doubt."[66] In that case, there was no evidence that the accused husband and wife ever even discussed their drug dealings.[67] Here, by

---

[64] 377 F. App'x 383, 387-88 (5th Cir. 2010) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553-54 (2007)) (holding that evidence of alleged co-conspirators taking turns selling drugs on the street showed merely conscious parallelism, not a concert of action).

[65] 569 F.2d 263 (5th Cir. 1978).

[66] *Id.* at 268.

[67] *See id.* at 267-68.

contrast, there is far more evidence of collaboration between Donovan and Orlando, including direct conversations in which they discussed prices and suppliers for drugs, offered each other advice, and seemed to rely on one another to complete deals. So, even though "it is well-settled that a conspiracy cannot be proven solely by family relationship or other types of close association,"[68] the jury had much more evidence to support its inferences in this case, and the conviction was not based on mere speculation.

A jury could reasonably infer an agreement between Donovan, Orlando, and others from this evidence. Moreover, a jury could reasonably conclude that the agreement, which entailed efforts to acquire large quantities of methamphetamine and potentially reached across state lines, went far beyond the sort of "single buy-sell agreement"[69] between "mere acquirers and street-level users"[70] that would qualify Donovan and Orlando for the buyer-seller exception to conspiracy. Therefore, the district court did not err in denying the motion for a judgment of acquittal on count one.

**B**

Count three charged Donovan with conspiring "to possess with intent to distribute a mixture or substance containing a detectable amount of methamphetamine" during a period "beginning on or about July 6, 2020, and continuing to on or about July 10, 2020, in Kemper County . . . and elsewhere." Donovan argues that the buyer-seller exception should apply

---

[68] *Id.* at 268.

[69] *See United States v. Jones*, 969 F.3d 192, 198 (5th Cir. 2020) (quoting *United States v. Delgado*, 672 F.3d 320, 333 (5th Cir. 2012) (en banc)).

[70] *See Delgado*, 672 F.3d at 333.

and that the Government did not prove his voluntary participation in the agreement beyond a single buy-sell agreement.

Based on the recorded phone calls and testimony, a reasonable juror could infer that Donovan voluntarily purchased methamphetamine from Marice Boler as part of an ongoing arrangement in order to resell methamphetamine to others. Donovan repeatedly asked Boler for more half-pound sales of the drug, a persistence that shows willing participation. Boler's testimony describing the sale on July 6 was sufficient evidence for the jury to determine that Boler had sold Donovan methamphetamine at least once. Additionally, the jury heard evidence that Boler had only sold Donovan one pound of methamphetamine on July 6, that Donovan asked for a half pound more during several subsequent phone calls, and that on July 11 Donovan "still got" two pounds of methamphetamine Boler had sold him. From that, a reasonable jury could infer that Donovan had purchased a half pound of methamphetamine from Boler on two occasions after the initial meeting on July 6 and before the evening of July 11. Moreover, the jury could infer from the large quantities that Donovan sought to purchase that he was not buying the drugs for personal consumption and that Boler would have known that. Finally, Donovan's comment in the second call on July 11 that he "don't be moving sh*t" and that he was "just put[ting] that sh*t up and wait[ing] 'til it get dry again" could reasonably be interpreted as meaning that he was stockpiling methamphetamine and waiting to sell it at a more opportune time. The jury and Boler could infer that he intended to distribute the methamphetamine to others.

Based on these inferences, a reasonable jury could conclude that Donovan voluntarily participated in multiple methamphetamine sales with Boler. The buyer-seller exception, which applies only to a "single buy-sell

agreement"[71] between "mere acquirers and street-level users,"[72] would not apply here.  Therefore, the district court did not err in denying Donovan's motion for a judgment of acquittal on count three.

## C

Orlando argues that the district court erred by failing to instruct the jury about the buyer-seller exception to drug trafficking conspiracies.  The parties agree that Orlando failed to object to the absence of this instruction at trial.  "[W]hen a defendant fails to object to jury instructions," this court "review[s] for plain error."[73]  As explained above, there was sufficient evidence for a reasonable jury to find Orlando guilty of conspiracy, and the buyer-seller exception did not apply.  Because the exception did not apply, the district court did not plainly err by failing to give such an instruction.

## V

Donovan and Orlando argue that a portion of the jury charge was improper because it could have been interpreted as pressuring the jury to reach a unanimous verdict.  While instructing the jury and before sending them to deliberate, the district court discussed the procedure for communicating with the court via jury notes.  In an attempt to avoid a mistrial, the judge added a specific instruction:

> I caution you, however, with regard to any message you might send that you should never state or specify your numerical division at the time.  Do not send me a message telling me you are divided by a particular vote.  If you do so, I might have to

---

[71] *See Jones*, 969 F.3d at 198 (quoting *Delgado*, 672 F.3d at 333).

[72] *See Delgado*, 672 F.3d at 333.

[73] *United States v. Capistrano*, 74 F.4th 756, 769 (5th Cir.) (quoting *United States v. Vasquez*, 677 F.3d 685, 692 (5th Cir. 2012) (per curiam)), *cert. denied*, 144 S. Ct. 516 (2023).

No. 23-60286

declare a mistrial, and that would require that the case be retried before another jury at considerable time and expense to all involved.

The Government argues that the instruction was warranted and did not amount to error. Orlando incorrectly briefs this issue as an *Allen*[74] instruction, but this was not an *Allen* charge because the court gave this instruction before any jury deliberations, let alone before any jury deadlock.[75]

Donovan and the Government agree that the defendants did not object to this instruction at trial, so we should review for plain error.[76] Orlando claims that the court should review the instruction for abuse of discretion but fails to note when the objection was raised, and no objection appears in the record. Therefore, we review the instruction for plain error.

To prevail on plain error review, Orlando and Donovan must "show that: '(1) the district court erred, (2) the error was clear or obvious, (3) the error affected [their] substantial rights, and (4) this court should exercise its discretion to correct the error because the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'"[77] Specifically,

---

[74] *Allen v. United States*, 164 U.S. 492 (1896).

[75] *See Montoya v. Scott*, 65 F.3d 405, 409 n.3 (5th Cir. 1995) (describing an *Allen* charge as "supplemental jury instructions that urge deadlocked juries to forego their differences in order to reach a unanimous verdict" (quoting *Boyd v. Scott*, 45 F.3d 876, 878 n.1 (5th Cir. 1994) (per curiam))).

[76] *Capistrano*, 74 F.4th at 769.

[77] *Id.* (quoting *In re Deepwater Horizon*, 824 F.3d 571, 583 (5th Cir. 2016) (per curiam)).

No. 23-60286

"[j]ury instruction error 'does not amount to plain error unless it could have meant the difference between acquittal and conviction.'"[78]

While it is true that "the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference,"[79] the judge's comments here did not amount to plain error. First, the complained-of instruction was a part of a valid procedural discussion on jury notes. Second, the specific warning about disclosing jury division is not unwarranted as "it is improper for the court to inquire of the jury division."[80] To be sure, the judge was incorrect in stating that a jury's disclosure of its division would, without more, be grounds for a mistrial,[81] but the judge's mistake as to the effect of such disclosure does not bear on the warning's validity or impact. Third, though Donovan and Orlando argue this instruction put pressure on jurors, the court's urging did just the opposite. Again, this instruction was in the context of jury notes, a process that the judge said would "take some time," so he asked the jury to "be patient." The jury could not have reasonably interpreted his request to be patient as pressuring them to come to a verdict. Lastly, far from discouraging jury division, the judge's instruction contemplated just that possibility and merely told the jury what not to do in such a case. In sum, the

---

[78] *United States v. Fairley*, 880 F.3d 198, 208 (5th Cir. 2018) (quoting *United States v. McClatchy*, 249 F.3d 348, 357 (5th Cir. 2001)).

[79] *Starr v. United States*, 153 U.S. 614, 626 (1894).

[80] *United States v. Warren*, 594 F.2d 1046, 1049 n.3 (5th Cir. 1979).

[81] *Id.* ("[T]he unsolicited disclosure of the jury division by the foreman is not by itself a ground for a mistrial."); *United States v. Tanios*, 82 F.3d 98, 101 (5th Cir. 1996) ("The mere fact that the jury made known its division to the court, without more, is not grounds for a mistrial.").

No. 23-60286

judge's comments resist the characterization the defendants ascribe to them and do not amount to plain error.

## VI

Donovan and Orlando argue that the district court erred in calculating their sentences under the Sentencing Guidelines. Specifically, they both argue that they did not manage or supervise the conspiracies and should not have received a three-level enhancement to their sentences under § 3B1.1(b). Additionally, Orlando argues that his sentence should not have been enhanced pursuant to § 2D1.1(b)(1) because he did not possess a gun while engaged in relevant conduct.

The defendants made these objections before the district court. We "review the district court's interpretation and application of the [Sentencing] Guidelines de novo and its factual findings for clear error."[82] "Generally, a PSR 'bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations.'"[83] "If the court determines that the factual allegations of the PSR are sufficiently reliable, then 'the defendant bears the burden of demonstrating that the PSR

---

[82] *United States v. Hernandez*, 876 F.3d 161, 164 (5th Cir. 2017) (per curiam) (citing *United States v. Trujillo*, 502 F.3d 353, 356 (5th Cir. 2007)).

[83] *United States v. Barfield*, 941 F.3d 757, 762 (5th Cir. 2019) (quoting *United States v. Nava*, 624 F.3d 226, 231 (5th Cir. 2010)).

is inaccurate; in the absence of rebuttal evidence, the sentencing court may properly rely on the PSR and adopt it.'"[84]

**A**

Section 3B1.1(b) of the Sentencing Guidelines directs a sentencing court to increase the offense level by three levels "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."[85] The second note following § 3B1.1 states that "[a]n upward departure may be warranted . . . in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization."[86] This court, "sitting en banc, has construed Note 2 to allow application of an *adjustment*, even where a defendant did not exercise control over another participant, if he exercised management responsibility over the property, assets, or activities of a criminal organization."[87] Panels of this court have subsequently relied on the note in deciding published cases.[88] Applying this standard in an unpublished case, *United States v. Hernandez*,[89] this court deemed an enhancement under § 3B1.1(b) warranted when "the record indicate[d] that [the defendant] exercised managerial

---

[84] *Id.* at 763 (quoting *United States v. Zuniga*, 720 F.3d 587, 591 (5th Cir. 2013) (per curiam)).

[85] U.S.S.G. § 3B1.1(b) (2023).

[86] *Id.* § 3B1.1, cmt. n.2 (2023).

[87] *United States v. Ochoa-Gomez*, 777 F.3d 278, 282-83 (5th Cir. 2015) (per curiam) (italics omitted) (citing *United States v. Delgado*, 672 F.3d 320, 345 (5th Cir. 2012) (en banc)).

[88] *See, e.g.*, *United States v. Akins*, 746 F.3d 590, 609 (5th Cir. 2014).

[89] 451 F. App'x 402 (5th Cir. 2011) (per curiam).

responsibility over the drugs and drug proceeds," even though the defendant's "primary role was not as a supervisor of other participants."[90] In another unpublished case, *United States v. Johnson*,[91] this court stated that it was "plausible to conclude," based on the PSR's evidence that the defendant "purchased drugs from [another], then sold those drugs to individuals in Midland," that the defendant "exercised control over the organization's drug supply to some extent."[92]

"We review a district court's factual finding that a defendant was a manager or supervisor under U.S.S.G. § 3B1.1(b) for clear error."[93] "A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole."[94]

**1**

Donovan argues that the district court clearly erred in accepting the PSR's determination that he was a manager or supervisor due to "a conspicuous absence of evidence that [he] managed or supervised anyone, participated in the planning and recruitment of accomplices, or exercised control and authority over others." However, as explained above, no such

---

[90] *Id.* at 404.

[91] No. 21-10454, 2022 WL 1773365 (5th Cir. June 1, 2022) (per curiam).

[92] *Id.* at *2 (also showing that the court considered other evidence that the defendant supervised other coconspirators).

[93] *Akins*, 746 F.3d at 609 (citing *United States v. Rose*, 449 F.3d 627, 633 (5th Cir. 2006)).

[94] *United States v. Hamilton*, 37 F.4th 246, 262 (5th Cir. 2022) (quoting *Akins*, 746 F.3d at 609).

evidence is required as long as he "exercised management responsibility over the property, assets, or activities of a criminal organization."[95]

Here, evidence in the PSR shows that Donovan exercised control over the price of the drugs involved in the conspiracy. The PSR also describes evidence showing that Donovan acquired large quantities of drugs and then sold them to others in smaller quantities. Additionally, evidence in the PSR shows that Donovan coordinated a delivery of at least one pound of methamphetamine and negotiated the price of that purchase. Though Donovan objects in response to this evidence that the PSR does not "allege that [Donovan] exercised management responsibility over a criminal organization's property, assets, or activities," he does not demonstrate that this information is inaccurate and therefore he does not meet his burden of undermining the PSR's reliability on this point. Finally, the PSR identifies at least four other codefendants who partook in the conspiracy with Donovan, and though he consistently objects that they did not conspire together, he does not object to the PSR's accuracy in naming them as his codefendants. Based on this evidence and its similarity to the evidence we deemed sufficient to show control over property, assets, or other activities in *Hernandez* and *Johnson*, the district court did not clearly err in enhancing Donovan's sentence pursuant to § 3B1.1(b).

**2**

Orlando argues that "[g]iven the Court's ruling, it is clear that [Orlando's] alleged supervision of his son was the determining factor that [Orlando] managed or supervised a participant" and that "the [July 2020] incident described by the court [relating to Orlando's son] was a separate incident from the conspiracy and, further, there was never a finding that the

---

[95] U.S.S.G. § 3B1.1, cmt. n.2 (2023).

separate incident was considered relevant conduct to the instant offense." Therefore, Orlando maintains, "the court erred in assessing an aggravating role to [Orlando] at sentencing."

Orlando is correct that the district court referenced Orlando's son in deciding to apply the § 3B1.1(b) enhancement. Specifically, the district court ruled, "The three-level adjustment at paragraph 60, 76 [pursuant to § 3B1.1(b)] is appropriate, because I find that there were five or more people involved in the conspiracy, including Mr. Orlando Bourrage's use of his son to assist or aid or direct his actions in the conspiracy." Even without considering the July 2020 incident with Orlando's son, though, there remains sufficient evidence in the record to affirm this sentencing enhancement.[96] As with Donovan, evidence in the PSR shows that Orlando exercised control over the price and sale of the drugs involved in the conspiracy. Additionally, the PSR identifies at least four other coconspirators, and though he consistently objects that they did not conspire together, he does not object to the PSR's accuracy in naming them as his codefendants. Again, given the similarities between this evidence and the evidence deemed sufficient to show management of property or assets of the conspiracy in *Hernandez*, the district court did not clearly err in determining that Orlando had supervisory or managerial authority for purposes of Sentencing Guidelines § 3B1.1(b).

**B**

Orlando argues that the district court erred in using his possession of a gun while distributing drugs in September 2020 to enhance his Guidelines range. Because the indictment only charged Orlando with conspiring during

---

[96] *See United States v. Garcia-Gonzalez*, 714 F.3d 306, 314 (5th Cir. 2013) ("We may affirm an enhancement on any ground supported by the record." (citing *United States v. Jackson*, 453 F.3d 302, 308 n.11 (5th Cir. 2006))).

May 2020 to possess methamphetamine with the intent to distribute it, Orlando argues that his possession of marijuana in September is not relevant conduct.

Section 2D1.1(b)(1) of the Sentencing Guidelines directs a sentencing judge to increase the offense level by two levels "[i]f a dangerous weapon (including a firearm) was possessed."[97] This court has held that district courts may "properly consider related relevant conduct in determining the applicability of section 2D1.1(b)(1)."[98] The Guidelines define relevant conduct as "includ[ing] 'all acts and omissions [that the defendant] committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused' and which 'occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.'"[99] Because "[a] defendant convicted of a drug offense is sentenced based on the amount of drugs involved in the offense,"[100] in a case involving drug trafficking, "relevant conduct may include all acts and omissions 'that were part of the same course of conduct or common scheme or plan as the offense of conviction.'"[101] An offense "qualif[ies] as part of the same course of conduct if [it is] . . . part of a single episode, spree, or ongoing series of offenses."[102] We inquire into this similarity by "look[ing] to 'the degree of similarity of the

---

[97] U.S.S.G. § 2D1.1(b)(1) (2023).

[98] *United States v. Paulk*, 917 F.2d 879, 884 (5th Cir. 1990).

[99] *United States v. Barfield*, 941 F.3d 757, 762 (5th Cir. 2019) (alteration in original) (quoting U.S.S.G. § 1B1.3(a)(1)).

[100] *Id.* (citing U.S.S.G. § 2D1.1(c)).

[101] *Id.* (quoting U.S.S.G. § 1B1.3(a)(2)).

[102] *United States v. Barry*, 978 F.3d 214, 219 (5th Cir. 2020) (quoting *United States v. Rhine*, 583 F.3d 878, 886 (5th Cir. 2009)).

offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.'"[103]   "Particularly in drug cases, this circuit has broadly defined what constitutes 'the same course of conduct' or 'common scheme or plan.'"[104]   "[T]he 'district court's determination of what constitutes relevant conduct for purposes of sentencing' is a factual finding that 'is reviewed for clear error.'"[105]

To be sure, in examining the similarity of the offenses, differences exist between the May 2020 conspiracy and the September 2020 incident. When Gowdy was arrested on May 28, officers found that he was transporting about five kilograms of methamphetamine and one pound of marijuana.  Ultimately, that arrest led to the Government charging Donovan Bourrage, Orlando Bourrage, Cordaryl Ford, and Rondarious Gowdy with conspiracy to possess methamphetamine with the intent to distribute it.  By contrast, Orlando allegedly purchased the marijuana discovered in September from a different source, Montreal Bourrage; he was found to be in possession of significantly more marijuana (1,319 grams, or three pounds); and no methamphetamine was involved in the September 2020 incident. However, either Orlando or a coconspirator possessed large quantities of marijuana in both instances, so there is at least some similarity between offenses.

Regarding the regularity of the offenses, the PSR indicates that Orlando's drug trafficking activity continued from May to September. Though the PSR only vaguely describes drug sales in June, it documents in

---

[103] *Id.* (quoting *Rhine*, 583 U.S. at 886).

[104] *Barfield*, 941 F.3d at 763 (quoting *United States v. Bryant*, 991 F.2d 171, 177 (5th Cir. 1993) (per curiam)).

[105] *Id.* at 761 (quoting *United States v. Wall*, 180 F.3d 641, 644 (5th Cir. 1999)).

detail drug transactions in July, including conversations on the subject on July 9, July 10, July 11, July 12, and July 28. Many of these deals involved Orlando purchasing either methamphetamine or marijuana from Montreal Bourrage. This evidence shows that the May and September incidents were not merely isolated incidents that took place several months apart from each other; rather, Orlando's possession of marijuana in September was part of a continuous stream of drug activity that agents had begun tracking in May. The regularity of the offenses favors viewing the September incident as relevant conduct.

Finally, regarding temporal proximity, the September 18 incident occurred about four months after Gowdy's arrest on May 28. We have deemed a gap of two months such a "close . . . temporal proximity" that it is a "strong indicator of relevance—enough to overcome weakness in another factor."[106] In so holding, we relied in part on the "well settled" law of this circuit "that offenses which occur within one year of the offense of conviction may be considered relevant conduct for sentencing."[107] A four-month gap is only slightly longer than the two months described as a strong indicator of relevance in *United States v. Barry*[108] and is far shorter than the year-long gap that we have also deemed acceptable. The four-month gap also differs starkly from cases that Orlando argues are similar to his, which feature a seventeen-month gap[109] and a twenty-one-month gap[110] separating the offense of conviction from the allegedly relevant conduct. Therefore, the

---

[106] *Barry*, 978 F.3d at 219-20.

[107] *Id.* at 220 (quoting *United States v. Ocana*, 204 F.3d 585, 590 (5th Cir. 2000)).

[108] 978 F.3d 214, 219 (5th Cir. 2020).

[109] *See United States v. Rhine*, 583 F.3d 878, 886-87 (5th Cir. 2009).

[110] *See United States v. Miller*, 179 F.3d 961, 967 (5th Cir. 1999).

temporal proximity here strongly indicates that the September incident is relevant conduct for the May conspiracy.

Given the existence of some similarity between the offenses, the regularity of Orlando's drug trafficking activity in the intervening period, and the relatively short temporal gap between the incidents, the district court did not clearly err in deeming the September arrest relevant conduct. Moreover, because § 2D1.1(b)(1) requires increasing the offense level by two when "a dangerous weapon (including a firearm) was possessed,"[111] and Orlando was found in possession of a firearm when he was arrested in September, the § 2D1.1(b)(1) enhancement was not clear error.

*    *    *

We AFFIRM the judgments of the district court.

---

[111] U.S.S.G. § 2D1.1(b)(1) (2023).